**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 3 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JULIO N. CASTORENA-JAIME,

      Defendant - Appellant.

No. 01-3061

(D.C. No. 00-40061-01-SAC)

(D. Kansas)

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ALMA R. TREJO,

      Defendant - Appellant.

No. 01-3067

(D.C. No. 00-40061-02-SAC)

(D. Kansas)

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

RAMONA ALVAREZ,

      Defendant - Appellant.

No. 01-3079

(D.C. No. 00-40061-03-SAC)

(D. Kansas)

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. Nos. 00-40061-01-SAC, 00-40061-02-SAC, & 00-40061-03-SAC)**

Anthony W. Mattivi, Assistant United States Attorney (James E. Flory, United States Attorney, and Nancy Landis Caplinger, Assistant United States Attorney, on the brief) Topeka, Kansas, for Plaintiff-Appellee.

David J. Phillips, Federal Public Defender, and Marilyn M. Trubey, Assistant Federal Public Defender, Topeka, Kansas, for Defendant-Appellant Julio Castorena-Jaime.

Edward M. Collazo, Topeka, Kansas, for Defendant-Appellant Alma R. Trejo.

Kevin J. Cook of Manzanares & Associates (F. G. Manzanares of Manzanares & Associates on the brief), Topeka, Kansas, for Defendant-Appellant Ramona Alvarez.

---

Before **EBEL**, **BALDOCK**, and **KELLY**, Circuit Judges.[*]

---

**BALDOCK**, Circuit Judge.

---

A Kansas highway patrol trooper stopped a vehicle driven by Defendant Alma R. Trejo for speeding. Defendants Julio Castorena-Jaime and Ramona Alvarez were passengers in the vehicle. After issuing a warning, the trooper noticed a brick-like bundle wrapped in tape on the rear floorboard of the vehicle. The trooper seized and searched the bundle, which contained cocaine. The trooper subsequently arrested Trejo, Castorena, and Alvarez.

A federal grand jury charged Defendants in a single-count indictment with possession with intent to distribute approximately 3.5 kilograms of cocaine, in violation

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of Appeal Nos. 01-3061 and 01-3067. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. These two cases therefore are ordered submitted without oral argument.

of 21 U.S.C. § 841(a)(1). Castorena entered a conditional guilty plea, but reserved the right to appeal the district court's denial of his suppression motion. The district court sentenced Castorena to 46 months imprisonment. Trejo and Alvarez proceeded to trial. The jury found both Trejo and Alvarez guilty as charged. The district court sentenced Trejo and Alvarez each to 78 months imprisonment. All three Defendants now appeal. Because Defendants' convictions arise out of the same factual occurrence, and Trejo and Alvarez raise the same issue on appeal, we address these appeals together.

Castorena raises only one issue on appeal: whether the trooper illegally seized and searched the bundle in the car. Trejo raises two issues on appeal: (1) whether the district court committed plain error by not sua sponte suppressing her statements allegedly obtained in violation of Miranda; and (2) whether the district court erred by denying Defendants' Batson objection to the prosecutor's peremptory strike of an African-American juror. Alvarez joins in Trejo's Batson issue, and raises three additional issues on appeal: (1) whether the district court erred in quashing the subpoena of co-defendant Castorena; (2) whether the district court erred by admitting the cocaine into evidence after officials repackaged it; and (3) whether the evidence was sufficient to convict her. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

I.

On May 16, 2000, Kansas Highway Patrol Trooper John Rule was patrolling Interstate 70 when he observed a grey Buick traveling in the opposite direction. Using

3

radar, he measured the Buick's speed at eighty miles per hour in a seventy-mile-per-hour zone. Turning around in the median, Trooper Rule caught up with the car and noticed it was missing a side mirror. Based on these traffic violations, he activated his emergency lights and pulled over the car. The activation of his lights triggered a video camera and recording equipment in Trooper Rule's patrol vehicle which recorded the traffic stop.[1]

Trooper Rule approached the car and saw two women sitting in the front seat, and a man lying down in the back seat. Speaking English, Trooper Rule explained the reasons for the traffic stop, and asked the driver for her license, registration, and proof of insurance. In response, the driver provided a Minnesota title in her name and a California driver's license identifying her as Alma Trejo. Trooper Rule observed the driver's demeanor was overly nervous for a typical traffic stop. Her hands were visibly shaking, and she made very little eye contact with him. Trooper Rule checked the license and title and handed them back to Trejo. He returned to his patrol car where he wrote a warning citation.

When he re-approached the vehicle to deliver the warning citation, Trooper Rule observed the man in the back seat sitting upright. Trooper Rule handed Trejo the warning citation and said "just a warning, no money." As was his practice while approaching or standing next to a stopped vehicle, Trooper Rule visibly checked the vehicle for evidence

---

[1] The Kansas Highway Patrol erased the beginning of this videotape during the copying process. Thus, the videotape shows the traffic stop only from the time Trooper Rule re-approaches the vehicle to hand Trejo the warning citation.

of any other criminal activity and stayed alert to each occupant's movements. Trooper Rule immediately noticed through the driver's side rear window a bundle laying on the floor behind the driver's seat. The bundle was approximately five to six inches wide, four to six inches tall, and approximately two inches thick. It was wrapped heavily in tape. Based on his training and experience, Trooper Rule immediately recognized from the bundle's wrapping and size that it was either illegal drugs or currency related to drug trafficking. Trooper Rule testified that during traffic stops he has seen "hundreds" of packages of similar size and wrapping. In his experience, these packages usually contained illegal drugs, and if not drugs, then currency involved in drug trafficking.

Speaking principally to the man in the back seat, later identified as Castorena, Trooper Rule pointed toward the bundle and asked "What do you have there in the back seat?" Defendants responded to Trooper Rule's question, but they cannot be heard on the videotape over background traffic noise. Trooper Rule testified that he observed Castorena trying to cover the bundle with trash on the floor of the vehicle. Trooper Rule again pointed towards the back seat and said, "No, the brick down there." The videotape captures Castorena moving in his seat, while Trooper Rule continues to point saying, "That thing right there." Trooper Rule finally extended his hand through the driver's window and pointed to the floor saying, "That, hand it to me." Castorena then gave Trooper Rule the bundle.

As he began inspecting the bundle, Trooper Rule asked, "What do you have here?"

5

Although Trejo's response is inaudible on the videotape, Trooper Rule testified that she responded that she did not know. Trooper Rule then asked, "May I open it?" Trejo's response again is inaudible, but Trooper Rule testified that Trejo responded affirmatively. Trooper Rule placed the bundle on top of the car, and using a knife from his pocket, he cut into the bundle. He found a white powdery substance that he testified smelled like cocaine.

Trooper Rule then instructed Defendants to turn off the vehicle and step out with their hands up. Castorena exited through the rear passenger door, and Trooper Rule told Castorena to lie down in the ditch. Trooper Rule testified that while he was dealing with Castorena, he noticed that the passenger, later identified as Alvarez, appeared to be putting something into or pulling something out of her pants. Trooper Rule can be heard on the videotape saying, "Ma'am, don't be shoving stuff down your pants." The videotape shows Trooper Rule approach Alvarez's side of the vehicle, and shows Alvarez exit the car. Alvarez lifted up her shirt and pulled her pants away from her waist to show Trooper Rule that she did not place any objects in her pants. Trooper Rule then told the female occupants to exit the car and lie down in the ditch.

Trooper Rule went to his patrol car and radioed for assistance. The audio portion of the videotape indicates Trooper Rule returned to the ditch and handcuffed Defendants. One of the female Defendants says something inaudible to which Trooper Rule responds with the questions, "Got more on you, huh ma'am!" and "How much are you out?" The

6

videotape again only captures inaudible responses from Defendants. Trooper Rule then directed one of the handcuffed female Defendants to sit down in the front seat of his patrol car, and began searching the back seat of the stopped car. When the female did not obey, Trooper Rule stopped his search and placed one female Defendant in his patrol car, and the other into the stopped car.[2] Trooper Rule then continued his search. Besides the bundle on the back seat floor, Trooper Rule found two bundles in Castorena's pants, and three more bundles in a black purse located on the passenger-side front floor board.[3]

## II.

Castorena appeals the district court's denial of a suppression motion. In reviewing the district court's denial of a motion to suppress, we view the evidence in the light most favorable to the Government. United States v. De la Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998). We accept the district court's factual findings unless they are clearly erroneous. Id. "'[A] finding is "clearly erroneous" when although there is evidence to

---

[2] The record is unclear as to which Defendant, Alvarez or Trejo, Trooper Rule placed in the patrol vehicle, and which he placed in the stopped vehicle.

[3] Trooper Rule questioned Castorena at the scene prior to giving Castorena any Miranda warnings. During this questioning, Trooper Rule turned off the audio recording on the videotape. After a few minutes of questioning, Trooper Rule turned the audio portion back on. Trooper Rule read Miranda warnings to Castorena in English. At the conclusion of the recitation of rights, Trooper Rule asked, "Do you understand all of that?" Castorena nodded his head slightly and made a response that is inaudible on the videotape. Trooper Rule then continued to question Castorena. Trooper Rule asked Castorena whether the cocaine was his, and Castorena said "yes." The district court suppressed Castorena's statements, both pre- and post-Miranda. The Government does not cross-appeal the district court's suppression of these statements.

support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Id. (brackets in original) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). The ultimate determination of reasonableness under the Fourth Amendment is a question of law we review de novo. De la Cruz-Tapia, 162 F.3d at 1277.

A.

Castorena first argues the district court erred by concluding Trooper Rule properly seized the bundle from the vehicle under the plain view doctrine. Although the Fourth Amendment generally requires officers conduct searches and seizures pursuant to a warrant, officers may seize evidence in "plain view" without a warrant. Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). A warrantless seizure of evidence is sustainable if (1) the police officer was lawfully located in a place from which to plainly view the item; (2) the officer had a lawful right of access to the item; and (3) it was immediately apparent that the seized item was incriminating on its face. United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). Castorena concedes Trooper Rule was lawfully positioned when he saw the bundle in plain view, and that he had a lawful right of access to the bundle. Castorena challenges only whether the bundle's incriminating nature was immediately apparent.

An item's incriminating nature is immediately apparent if "the officer had probable cause to believe the object was contraband or evidence of a crime." Id.; see also Arizona

8

v. Hicks, 480 U.S. 321, 326 (1987) (requiring officer to have probable cause to seize under plain view doctrine). A seizing officer need not "know" or have an "unduly high degree of certainty" as to the incriminatory character of the evidence under the plain view doctrine. Texas v. Brown, 460 U.S. 730, 741 (1983). All that is required is a "practical, nontechnical probability that incriminating evidence is involved." Id. at 742 (internal quotations and citation omitted).

We agree with the district court that the bundle's incriminating nature was immediately apparent. The record reflects that Trooper Rule has undergone extensive criminal interdiction training, and has participated in over 150 large drug seizures. Trooper Rule testified that the bundle he observed in this case was similar in size and packaging to bundles seized in other drug seizures in which he has been involved. He further testified he has not seen a similarly taped bundle of this size that did not contain either drugs or drug trafficking proceeds. Viewing the videotape, Trooper Rule's instantaneous reaction upon seeing the bundle shows he immediately recognized its incriminating nature. As the district court noted, Defendants' inability to explain the package, and Castorena's "fumbling efforts" to conceal the bundle under trash on the floor board heightened Trooper Rule's suspicions about the bundle's contents.

Castorena argues that in other cases involving opaque containers, the officers had additional evidence beyond the mere appearance of the container to hint at the container's contents or to suggest the suspect was engaged in narcotics trafficking. We have no

9

difficulty affirming the district court's finding that the bundle's appearance, viewed through Trooper Rule's experienced eye in the context presented in this case, gave him probable cause to suspect the bundle contained contraband or evidence of criminal activity. Trooper Rule's inability to see through the opaque tape around the bundle is "all but irrelevant: the distinctive character of the [container] itself spoke volumes as to its contents–particularly to the trained eye of the officer." Brown, 460 U.S. at 743 (finding seizure lawful where officer observed defendant drop a narcotic-filled balloon).

Castorena's effort to liken his case to United States v. Doe, 61 F.3d 107 (1st Cir. 1995), is equally unavailing. In Doe, airport security officials seized blocks wrapped in opaque tape that were hidden in a closed box. The Drug Enforcement Agency (DEA) then pierced the tape to test the substance within the blocks. The First Circuit held unconstitutional the DEA's warrantless search of the taped blocks' contents. Doe stands for the proposition that the DEA impermissibly opened, and therefore searched, the package's contents without a warrant. Id. at 113. Doe assumed, without deciding, that the officer's seizure of the taped packages during an administrative airport security check was permissible under the plain view doctrine. Id. at 110. Hence, Doe does not suggest that seizing the container in the first place based on its plain view appearance was impermissible. As stated by the Doe court, "Although probable cause, as well as exigent circumstances, may support the warrantless seizure of an enclosed opaque container, the same probable-cause showing is not necessarily sufficient to justify its subsequent

10

warrantless <u>search</u>." <u>Id.</u> (emphasis in original) (internal citation omitted). Thus, <u>Doe</u> was concerned with warrantless searches of opaque containers, and not seizures under the plain view doctrine.

B.

Castorena next contends that even if Trooper Rule permissibly seized the bundle, his subsequent warrantless search of the bundle was unconstitutional. The district court ruled the search was permissible under the automobile exception to the warrant requirement, or alternatively, because Trejo consented to the search.[4] We need not address the automobile exception's applicability, because we affirm the district court's finding that Trejo consented to the search. Castorena's only challenge to the district court's holding that Trejo consented to the search is to attack Trooper Rule's credibility. Trejo's response to Trooper Rule's request for permission to open the package is inaudible on the videotape. Castorena argues we should not believe Trooper Rule's testimony concerning Trejo's consent. "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." <u>United States v. Long</u>, 176 F.3d 1304, 1307 (10th Cir. 1999). The district court found Trejo consented to the search. Based upon our review of the record, this finding is not clearly erroneous. Because we find the seizure and

_____

[4] <u>Doe</u> does not assist Castorena in his argument that Trooper Rule's warrantless search was unconstitutional. Unlike the agents in <u>Doe</u>, Trooper Rule's search falls within at least one exception to the warrant requirement, consent.

11

subsequent search constitutional, we affirm the district court's denial of Castorena's suppression motion.

III.

Trejo argues the district court erred by allowing into evidence her post-arrest statement in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Trejo concedes she did not preserve this issue through objection or motion below. We therefore review this claim for plain error. Fed. R. Crim. P. 52(b). Under plain error review, Trejo must demonstrate that (1) the district court erred; (2) the error was plain; (3) the error affected her substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. <u>United States v. Hishaw</u>, 235 F.3d 565, 574 (10th Cir. 2000) (citing <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993)).

At the station house, Trooper Rule questioned Trejo and Alvarez together. Trooper Rule advised Defendants of their <u>Miranda</u> rights in English. Trooper Rule testified that "one of the sisters," <u>i.e.</u>, Alvarez or Trejo, said she did not understand.[5] At that point, Trooper Rule asked "the other sister" to translate the <u>Miranda</u> warning into Spanish. Trooper Rule admitted he had no way of knowing what was said. After the interpretation, Trooper Rule asked Trejo whether she understood her rights, and Trejo

---

[5] Trooper Rule testified he could not remember whether Trejo or Alvarez said she did not understand the <u>Miranda</u> warnings, but both Defendants stated they understood their rights. He testified further, however, that he specifically recalled Trejo making the statement that she knew the packages were in the vehicle, but did not know what was in them. He testified Alvarez claimed she did not know anything about the packages.

12

said yes. Trejo then admitted she knew the packages were in the car, but did not know what was in them. Trejo's statement was admitted at trial.

Trejo now argues the district court plainly erred by not sua sponte suppressing her statements as involuntary. Trejo asserts she did not understand the English Miranda warnings, and the Government cannot meet its burden of showing Alvarez gave Trejo adequate Miranda warnings in Spanish. The Government responds that Trejo actually understood English, as demonstrated by her immediate and proper responses to Trooper Rule's commands and questions as seen on the videotape. Additionally, the Government argues that although having a fellow detainee translate is not preferred, the practice is not completely prohibited. The Government contends Trejo received adequate warnings in her native tongue, and indicated she understood her rights.

Ultimately, the parties disagree over the factual question of whether Trejo understood English, or alternatively whether she received proper Miranda warnings in Spanish. Factual issues such as the claimed inability to understand English, or whether Defendant understood her Miranda rights, are questions of fact which underlie the legal question of whether Defendant's waiver of rights was knowing and voluntary. See Valdez v. Ward, 219 F.3d 1222, 1231 (10th Cir. 2000). "This court has held repeatedly that factual disputes not brought to the attention of the court do not rise to the level of plain error." United States v. Svacina, 137 F.3d 1179, 1187 (10th Cir. 1998) (citing United States v. Yarnell, 129 F.3d 1127, 1137-38 (10th Cir. 1997)); see also United States

13

v. Deninno, 29 F.3d 572, 580 (10th Cir. 1994) ("[F]actual disputes do not rise to the level of plain error."). We cannot say the district court plainly erred by not sua sponte suppressing Trejo's statements where the factual dispute over Trejo's understanding of her Miranda warnings was never brought to the district court's attention for resolution.

We take this opportunity, however, to caution the Government's law enforcement agents about using co-detainees, particularly co-defendants, to interpret Miranda warnings to a criminal defendant. See United States v. Villegas, 928 F.2d 512, 518 (2d Cir. 1991) ("[I]t is undesirable to have a co-defendant read Miranda rights."). A co-defendant has a strong incentive to incriminate the person for whom they are translating. See United States v. Caba, 955 F.2d 182, 185-86 (2d Cir. 1992) (detainee has strong incentive to lie where his assistance in procuring a confession may win him leniency). This is particularly so in the case of co-defendants, who stand to gain by shifting the blame to another. Id. We urge police officers to cease using co-defendants as interpreters in the future to avoid possible reversible error.

IV.

Defendants Trejo and Alvarez jointly assert the prosecutor violated Batson v. Kentucky, 476 U.S. 79 (1986), by using a peremptory challenge to strike an African-American juror from the panel. In reviewing the district court's disposition of a Batson claim, we review de novo whether the striking party's proffered explanation is race

14

neutral.  United States v. Sneed, 34 F.3d 1570, 1580 (10th Cir. 1994).  We review for clear error the district court's finding of whether the striking party had discriminatory intent.  United States v. Davis, 40 F.3d 1069, 1077 (10th Cir. 1994).  "[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."  Sneed, 34 F.3d at 1579 (internal quotation and citation omitted).

A party's use of a peremptory challenge to exclude a juror based on the juror's race violates the United States Constitution.  Batson, 476 U.S. at 89.  Neither the prosecutor nor the defendant may use their peremptory strikes to exclude from the jury panel members of specific racial groups on the basis of the juror's race.  Georgia v. McCollum, 505 U.S. 42, 59 (1992).  A defendant who objects to the prosecutor's strike of a juror need not be of the same race as the juror to state a valid Batson objection.  Powers v. Ohio, 499 U.S. 400, 415-16 (1991).[6]

In Batson, the Supreme Court set forth a three-step procedure for resolving objections to peremptory challenges.  First, the objector must make a prima facie showing that the peremptory challenge is based on race.  Batson, 476 U.S. at 94-97.  If the objector meets this burden, the party striking the juror must articulate a race-neutral explanation

---

[6] Defendants complain the prosecutor erroneously informed the district court that Defendants had to be the same race as the struck juror to raise a Batson challenge.  The prosecutor misstated the law on this point before the district court, however, the record does not reflect that the district court relied on the prosecutor's statement of the law in making its ruling.

15

for striking the juror.  Id. at 97.  If the court finds the striking party's reason is race neutral, the court must determine whether the objecting party has shown purposeful discrimination.  Id. at 98.  The party objecting to the use of the peremptory challenge carries the ultimate burden of persuasion.  Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 854 (10th Cir. 2000) (citing Purkett v. Elem, 514 U.S. 765, 768 (1995)).

Defendants argue the district court failed to properly apply the Batson three-step procedure, and that the district court was confused about which party bore the burden of persuasion at each step.  Although the colloquy between court and counsel on this point was less than clear, the district court ultimately followed Batson's three-step procedure.  First, Defendants objected that the prosecutor used a peremptory challenge to excuse Mrs. Foster.  Defense counsel identified Mrs. Foster as a member of a minority race, African-American, and stated that because no apparent reason existed for the challenge, the inference was that the Government excused her on the basis of her race.  Although the district court initially found Defendants did not state a prima facie objection, the court went on to analyze steps two and three of the Batson inquiry.  Thus, we may assume Defendants established a prima facie Batson showing.  Sneed, 34 F.3d at 1579 (Once the prosecutor offers a race-neutral explanation, and the district court rules on the ultimate question of discriminatory intent, "'the preliminary issue of whether the defendant had made a prima facie showing becomes moot.'") (quoting Hernandez v. New York, 500 U.S. 352, 359 (1991)).

At step two of the <u>Batson</u> inquiry, the prosecutor offered the race-neutral explanation that he struck Mrs. Foster because she was nervous and distracted, and because she might be inattentive due to concerns about her work situation.[7]  Defendants concede that juror inattentiveness during voir dire is a legitimate, race-neutral basis for a peremptory strike under <u>Batson</u>.  <u>Davis</u>, 40 F.3d at 1077; <u>United States v. Johnson</u>, 4 F.3d 904, 913 (10th Cir. 1993).  Distraction caused by employment concerns and nervousness are also factors unrelated to a juror's race.  <u>See</u> <u>Hidalgo v. Fagen, Inc.</u>, 206 F.3d 1013, 1019 (10th Cir. 2000) ("A neutral explanation means an explanation based on something besides the race of the juror."); <u>Sneed</u>, 34 F.3d at 1579 ("[U]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."); <u>see also</u> <u>United States v. Hunter</u>, 86 F.3d 679, 683 (7th Cir. 1996) (upholding district court's rejection of <u>Batson</u> challenge where prosecutor struck juror because of a "gut feeling" based in part on the extremely nervous and hesitant way the juror answered voir dire questions); <u>United States v. Briscoe</u>, 896 F.2d 1476, 1489 (7th Cir. 1990)

---

[7] The first day of jury selection, Mrs. Foster, along with five other jurors from the jury pool, expressed concern about serving on the jury due to other conflicts.  Mrs. Foster indicated she might be unable to make arrangements for someone to cover her work duties.  By the next day of jury selection, however, Mrs. Foster indicated she had made arrangements for her work to be covered and would like to serve.  The prosecutor did not question Mrs. Foster during voir dire.  Defendants questioned Mrs. Foster and she indicated that her employment concerns would not interfere with her service on the jury.  During defense questioning on voir dire, Mrs. Foster hesitated in response to a question.  When defense counsel asked Mrs. Foster what was wrong, Mrs. Foster stated, "Nothing, I'm just a little nervous."

(noting that jury selection may be influenced by "'intuitive assumptions that are not fairly quantifiable'") (quoting United States v. Lance, 853 F.2d 1177, 1181 (5th Cir. 1988)). Thus, the prosecutor met his burden under step two of the Batson analysis by articulating race-neutral explanations for striking Mrs. Foster.

Defendants contend, however, the district court erred at the third Batson step by failing to make any findings on the record regarding Mrs. Foster's alleged nervousness, inattentiveness, or level of distraction, and by finding the prosecutor's explanation was not pretextual. From the bench, the district court stated simply that Defendants' challenge was overruled, and that Mrs. Foster was excused. During a later session in chambers, the district court stated:

> I want to further put on the record that as to the Batson challenge, the court finds and does find now that there wasn't a basis for the – for the Batson challenge made by defense counsel . . . . The court listened to the government's reason and found that that reason was appropriate . . . .

The court did not, however, make any specific findings on the record that Mrs. Foster was nervous or inattentive, or that the court found the prosecutor credible.

Although we affirm the district court's ruling, we encourage district courts to make explicit factual findings on the record when ruling on Batson challenges. "Specifically, . . . a district court should state whether it finds the proffered reason for a challenged strike to be facially race neutral or inherently discriminatory and why it chooses to credit or discredit the given explanation." United States v. Perez, 35 F.3d 632, 636 (1st Cir. 1994). A district court's clearly articulated findings assist our appellate review of the court's

18

Batson ruling, and "ensure[] that the trial court has indeed made the crucial credibility determination that is afforded such great respect on appeal." Id. We have previously cautioned that–

> [d]etermining who is and is not attentive requires subjective judgments that are particularly susceptible to the kind of abuse prohibited by Batson. . . . [A] prosecutor's explanation of challenges on the grounds of inattentiveness deserves careful scrutiny by the district court, and special care by counsel to fully develop the record concerning the specific behavior by venire members motivating counsel to make a peremptory challenge based on inattentiveness.

Johnson, 4 F.3d at 913.

Notwithstanding the district court's failure to make express findings on the record in the present case, the district court's ultimate conclusion on discriminatory intent was not clearly erroneous. Mrs. Foster initially expressed reservations about serving on the jury. Although she later made arrangements to accommodate her employment issues and indicated she would like to serve, the prosecutor still may have harbored concerns about whether Mrs. Foster's work situation would distract her.[8] As to Mrs. Foster's alleged

---

[8] Defendants contend the prosecutor did not exercise peremptory challenges to excuse any of the other similarly situated jurors who approached the bench the first day of jury selection with potential jury service problems. See United States v. Johnson, 941 F.2d 1102, 1109 (10th Cir. 1991) (considering Government's peremptory strike of non-minority juror with similar characteristics as struck minority juror to support finding of no pretext); United States v. Jenkins, 52 F.3d 743, 747 (8th Cir. 1995) ("Pretext can be shown by evidence that non-stricken white panel members share the characteristics of a stricken minority panel member."). We have reviewed the record and note that the Government never waived a peremptory challenge as to these jurors. Three of the five similarly situated jurors were excused for cause by the district court before either side had an opportunity to peremptorily strike the juror. Another juror remained in the jury pool,

nervousness, Mrs. Foster herself stated she was nervous. No other juror stated on the record that he or she was nervous, nor did counsel or the court comment on any other juror's nervousness. The district court's ruling indicates it implicitly found the prosecutor credible. The "trial court's findings on the issue of discriminatory intent largely turn on an evaluation of the prosecutor's credibility." Sneed, 34 F.3d at 1579. "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" Hernandez, 500 U.S. at 365 (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)). "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Hernandez, 500 U.S. at 369 (internal quotation and citation omitted). Giving due deference to the district court's opportunity to evaluate the prosecutor's credibility, the district court believed the prosecutor's legitimate explanations for striking the juror, and that ruling is not clearly erroneous. See Johnson, 4 F.3d at 913 ("The district court is in the best position to observe the demeanor and credibility of the prosecutor and the witness.") (internal quotation and citation omitted).[9]

---

never having been called to the jury panel. The prosecutor could have excused only one juror besides Mrs. Foster who initially approached the bench with concerns about serving on the jury. The prosecutor could have used his first peremptory challenge to excuse this juror, but chose to excuse another juror instead. By the time the Government had another opportunity to peremptorily strike the juror, Defendants had already excused her. No juror who initially approached the bench with concerns the first day of jury selection remained on the jury.

[9] As evidence of alleged pretext, Defendants argue the prosecutor's treatment of other minorities on the jury panel demonstrates his explanations were pretextual.

V.

Defendant Alvarez next argues the district court erred in quashing the subpoena issued to co-defendant Castorena. We review the district court's rulings on subpoenas for an abuse of discretion. United States v. Greschner, 802 F.2d 373, 378 (10th Cir. 1986).

Prior to trial, Castorena apparently communicated with co-defendant Trejo, indicating he was going to take full responsibility for the cocaine. Trejo and Alvarez thus sought to subpoena Castorena to appear at trial. Castorena filed a motion to quash the subpoena on grounds that he was going to invoke his Fifth Amendment right to avoid compelled self-incrimination. The district court directed Alvarez and Trejo to prepare a list of questions they intended to ask Castorena. In response to the questions, Castorena filed an affidavit stating that he would decline to answer all questions, except his name,

Specifically, Defendants note the Government used its first peremptory challenge to excuse juror Beck, who stated his father was Hispanic. Because Defendants did not object to this strike, we have no explanation for the prosecutor's strike. Any attempt to discern the prosecutor's reason for striking Beck would be pure speculation at this point. We note, however, that juror Rivera, who was Hispanic, remained on the jury, despite the prosecutor still having peremptory challenges available to remove minority jurors, if that was his intention. See United States v. Williamson, 53 F.3d 1500, 1510 (10th Cir. 1995) ("[A]lthough the mere presence of members of a certain race on the final jury does not automatically negate a Batson violation, . . . it can be a relevant factor, particularly when the prosecution had the opportunity to strike them."). Additionally, Defendants assert the prosecutor questioned juror Rivera differently than he questioned other jurors, by asking Rivera whether he would feel sorry for the Defendant or the Government. During voir dire, the prosecutor's modus operandi was to ask one juror a question or two, and then ask the entire panel if they agreed or disagreed with the juror's answer. Rivera was treated no differently, and the prosecutor asked the entire panel about sympathy towards either party. The prosecutor did not single out Rivera for hostile treatment.

21

on Fifth Amendment grounds. At the time of the subpoena, Castorena had entered a conditional guilty plea, and was awaiting sentencing. Alvarez contends the district court should have compelled Castorena to take the stand in front of the jury, and then determine, as to each question, whether Castorena's answer to the particular question would subject Castorena to possible self incrimination.

The district court decides in the first instance whether a witness' silence is justified. United States v. Hart, 729 F.2d 662, 670 (10th Cir. 1984). The court should order a witness invoking his Fifth Amendment rights to answer questions "'only if it is "perfectly clear" that the witness is mistaken and the answers "cannot possibly" tend to incriminate. In making this determination the judge must liberally construe the privilege in favor of the right it was intended to secure.'" Id. (quoting United States v. Nunez, 668 F.2d 1116, 1121 (10th Cir. 1981)). A defendant facing impending sentencing legitimately may fear incurring additional criminal liability through compelled testimony. See United States v. Garcia, 78 F.3d 1457, 1463 (10th Cir. 1996) (concluding that the Fifth Amendment continues to protect Defendant during sentencing because such testimony could subject him to further criminal liability).[10] Castorena was awaiting sentencing at the time he was under subpoena. Further, Castorena had entered a conditional guilty plea.

---

[10] See also United States v. Dago, 33 F.3d 63, 1994 WL 387836, at *6 (10th Cir. 1994) (unpublished) ("A defendant confronting impending sentencing may have a reasonable basis to fear incurring additional criminal liability if forced to testify.") (citing United States v. Hernandez, 962 F.2d 1152, 1161 (5th Cir. 1992)).

22

If Castorena prevailed on appeal, his testimony at his co-defendants' trial certainly would have incriminated him.

Alvarez argues the jury was entitled to observe Castorena's "non-verbal communications" on the witness stand. Defendants do not, however, have the right to force a witness to invoke his Fifth Amendment privilege before the jury. Hart, 729 F.2d at 670.[11] "'[T]he jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense.'" Nunez, 668 F.2d at 1123 (quoting Bowles v. United States, 439 F.2d 536, 541 (D.C. Cir. 1970)). The district court did not abuse its discretion by refusing to allow Defendants to compel Castorena to appear before the jury simply to invoke his Fifth Amendment rights.

## VI.

Alvarez next argues the district court abused its discretion by admitting into evidence the repackaged cocaine. We review the district court's ruling admitting evidence for an abuse of discretion if an objection is timely made, but if no objection is made, for plain error. United States v. Magleby, 241 F.3d 1306, 1315 (10th Cir. 2001).

The six bundles Trooper Rule seized from the car were packaged originally in

---

[11] See also United States v. Quary, 188 F.3d 520, 1999 WL 546999, at *7 n.8 (10th Cir. 1999) (unpublished) ("We note that Quary would not have been permitted to force the witness to take the stand just to invoke her Fifth Amendment privilege with respect to individual questions.") (citing Hart, 729 F.2d at 670).

23

opaque tape. The Government introduced into evidence, without objection, photographs of the bundles in their original condition as exhibits one through five. Alvarez objected when the Government attempted to introduce into evidence exhibits eleven through fourteen. Exhibits eleven, twelve, and thirteen were clear bags, each containing two bundles' worth of cocaine. Exhibit fourteen was the packing material in which the bundles were originally wrapped. Before the district court, Alvarez objected to the admission of these exhibits, alleging the Government had not established a chain of custody because of the cocaine's altered appearance. On appeal, Alvarez argues the district court should have refused to admit the cocaine because its prejudicial value significantly outweighed its probative value. Alvarez argues that because this case is largely about her knowledge and participation, allowing the Government to present the cocaine in clear bags, and in larger units than originally found, unfairly prejudiced her by suggesting the cocaine was in plain view. Even if we liberally construe Alvarez's objection below to include a prejudice argument, the district court did not abuse its discretion by admitting the cocaine into evidence.

Contrary to Alvarez's assertions, the jury was fully informed about the cocaine's original appearance and about how the cocaine and packaging came to look like exhibits eleven through fourteen. The Government presented the jury with exhibits one through five which depicted the bundles as they appeared at the scene of the traffic stop. Drug Enforcement Agency Special Agent Jeffrey Kratowicz then testified that the bundles were

24

sent to a lab for testing, and came back unwrapped and repackaged as they appeared in exhibits eleven through thirteen. The Government also presented exhibit fourteen, which Kratowicz identified as the original packaging material around the cocaine. Thus, the Government made clear to the jury that exhibits eleven through thirteen did not reflect the original appearance of the cocaine, and that the Government had modified the packaging.

We have previously held that even where the Government lost the container in which the narcotics were originally discovered, the narcotics themselves were still admissible. See United States v. Cardenas, 864 F.2d 1528, 1532-33 (10th Cir. 1989) (cocaine admissible even though police lost the brown paper bag in which the cocaine was originally found); United States v. Obregon, 748 F.2d 1371, 1381 (10th Cir. 1984) (cocaine admissible even though police lost the cardboard box drugs were contained in where defendant argued the cardboard box would corroborate his claim he was unaware of the box's contents). Here, the police did not completely destroy or lose the wrappings. Further, the Government presented the jury with evidence of the cocaine's appearance both before and after the alteration. The Government's failure to produce the cocaine in its original appearance goes to the weight of the evidence, not its admissibility. See United States v. Humphrey, 208 F.3d 1190, 1205 (10th Cir. 2000) (deficiencies in chain of custody go to weight of evidence); Cardenas, 864 F.2d at 1532 (so long as the evidence's relevant features remain unaltered, it is admissible). "'[T]he jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence.'" Humphrey,

25

208 F.3d at 1190 (quoting Cardenas, 864 F.2d at 1531).  The district court did not abuse its discretion by admitting exhibits eleven through fourteen into evidence.

VII.

Finally, Alvarez argues the evidence was insufficient to convict her of possession with intent to distribute.  We review sufficiency of evidence claims de novo.  United States v. Vallo, 238 F.3d 1242, 1246 (10th Cir. 2001).  Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the Government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  Id. at 1247.  In reviewing the evidence, we do not weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury.  United States v. Sanders, 240 F.3d 1279, 1281 (10th Cir. 2001).

To establish a violation of 21 U.S.C. § 841(a)(1), the Government must prove Alvarez (1) possessed a controlled substance; (2) knew she possessed a controlled substance; and (3) intended to distribute the controlled substance.  United States v. Dozal, 173 F.3d 787, 797 (10th Cir. 1999).  Possession may be actual or constructive.  United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997).  In this case, the Government relied on the theory of constructive possession to show Alvarez jointly possessed the cocaine with her co-defendants.  To prove constructive possession, the Government must show that Defendant knowingly held "ownership, dominion or control" over the object and premises where the contraband was found.  United States v. Jones, 44 F.3d 860, 869 (10th

26

Cir. 1995) (internal quotation and citation omitted).  "Constructive possession may be established by circumstantial evidence and may be joint among several individuals."  United States v. Carter, 130 F.3d 1432, 1441 (10th Cir. 1997) (internal quotation and citation omitted).  In joint occupancy cases where the Government seeks to prove constructive possession through circumstantial evidence, the Government "must present evidence to show some connection or nexus between the defendant and the . . . contraband."  United States v. Heckard, 238 F.3d 1222, 1228 (10th Cir. 2001) (internal quotation and citation omitted).

Alvarez's mere presence in the car with the cocaine is insufficient to prove this nexus.  Jones, 44 F.3d at 865.  The jury, however, received additional evidence connecting Alvarez to the cocaine.  Alvarez and her companions were in a lengthy cross-country trip from California to Minnesota.  The jury could reasonably infer that Alvarez had seen and discussed the packages in her companion's pants and in the black bag in the front seat.  Trooper Rule found the black bag containing three bundles of cocaine on the floorboard at Alvarez's feet.  The police located numerous purses in the car, but only two purses contained any items.  Trooper Rule found the first purse, which contained papers belonging to Trejo, in the trunk.  Trooper Rule discovered the second purse, the black bag containing the cocaine, at Alvarez's feet.  Although Trooper Rule did not find identifying documents in the black bag, he discovered Alvarez's identification documents in an address book located inside the car's passenger compartment.  During the arrest, Trooper

Rule saw Alvarez making furtive movements in the general area of the black bag while he was handcuffing Castorena. The jury could reasonably infer that the two women in the car each had a purse, that the black bag was Alvarez's because the other purse was clearly Trejo's, and that when Trooper Rule thought Alvarez was putting something into her pants, she was actually removing her identifying documents from the black bag. Finally, Alvarez made conflicting and incriminating statements. At first, Alvarez denied any knowledge concerning the bundles. Later, during booking, Alvarez spontaneously stated to agents that she told her lawyer she knew the packages were in the vehicle, but did not know what was in them. A reasonable jury could find from this evidence that Alvarez knowingly possessed the cocaine with intent to distribute.

AFFIRMED.