**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

KEVIN LEE HEBAH,

      Defendant-Appellant.

No. 04-8092
(D. Wyo.)
(D.Ct. No. 02-CR-201-B)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**LUCERO**, Circuit Judge.

Appellant Kevin Lee Hebah was convicted of one count of sexual abuse by

engaging in a sexual act with another person incapable of appraising the nature of

the conduct or physically incapable of declining participation, while on an Indian

Reservation, in violation of 18 U.S.C. §§ 1153 and 2242(2)(A) and (B). He

appeals, contesting the government's peremptory strike of two Native American

---

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

jurors, use of an *Allen* instruction, and exclusion of his expert witness at trial. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.  Factual Background

On August 25, 2002, Todd Dawson, a special agent with the Federal Bureau of Investigation (FBI), learned an ambulance delivered a seventeen-year-old Native American girl to the Lander Valley Medical Center in Lander, Wyoming, and that she may have been sexually assaulted the prior evening while on the Wind River Indian Reservation at a party attended by several individuals.  As part of his investigation, Agent Dawson interviewed several of the partygoers, who gave consistent statements concerning the events of the evening of August 24, 2002.  Many of these individuals also gave consistent testimony at trial, as reflected hereafter.

According to witnesses, a party, which both the seventeen-year-old girl and Mr. Hebah attended, began at a house on the Indian Reservation.  After the girl became extremely intoxicated, she went with others to a party at another house; when she became unconscious, she was placed on a couch in the living room and a blanket was thrown over her.

At some point, the partygoers left the house, with the exception of the unconscious teenager and Mr. Hebah. When some of the men returned, they saw Mr. Hebah on top of the unconscious girl, with both of their pants down and her legs spread; when Mr. Hebah heard the men enter, he jumped up, walked into a bedroom and returned with his pants on. Several individuals entered the house at this time and noticed the unconscious girl lying on the floor with her pants and underwear down and her private parts exposed. One witness noticed Mr. Hebah standing in the living room with his pants zipper down. A woman attending the party confronted Mr. Hebah and told him the only way he could "get a girl" was if she was "passed out," to which he responded, "Yeah, yeah, so I did it. So what?" Some of those present carried her into a bedroom, put her on the bed, pulled her underwear and pants up, and covered her with a blanket.

Later, when three individuals walked into the bedroom to check on the teenager they saw both her and Mr. Hebah without any pants or underwear on and witnessed him between the unconscious girl's legs. One individual saw Mr. Hebah's buttocks moving up and down. After they entered the room, Mr. Hebah turned over and pretended to be asleep. Others came down the hall and saw the girl's pants and underwear down and Mr. Hebah laying beside her. Some began to dress the teenager, while others started beating Mr. Hebah. Several individuals

loaded the girl into the back of a pickup truck and took her to another home, where one person woke his father and told him the seventeen-year-old may have "been taken advantage of," after which an ambulance took her to the hospital. The seventeen-year-old girl remembered seeing Mr. Hebah at the first house, but did not remember leaving, going to the next house, or any other events of the evening. When she woke up in the hospital, she was still intoxicated.

Following his interviews of the partygoers, Agent Dawson contacted Mr. Hebah by telephone and invited him to come to his Lander FBI office for an interview concerning the events of the evening of August 24, 2002. Mr. Hebah voluntarily appeared, Mr. Dawson read him his *Miranda* rights, and he agreed to waive those rights, as evidenced by a written *Miranda* rights form, with each right initialed by Mr. Hebah, and a waiver of those rights signed by Mr. Hebah. After talking for approximately half an hour, Mr. Dawson suggested they write down Mr. Hebah's statement, to which Mr. Hebah agreed.

Mr. Hebah's written confession began by stating Agent Dawson made no promises and used no pressure, and he understood he was not under arrest, did not have to talk to the agent, and could leave at any time. Mr. Hebah identified many of the individuals who were at the first house and stated a bunch of them ended

up going to the second house, although he did not remember going there. Mr. Hebah stated he did not remember much about the evening because he was drunk, but he did remember having sex with the unconscious seventeen-year-old girl by putting both his finger and his penis inside her vagina, although he did not remember if he ejaculated. He also remembered being awakened in the bedroom where the seventeen-year-old laid "passed out," and then people kicking and hitting him. After Mr. Hebah read his statement out loud to both Agent Dawson and another agent, he acknowledged everything in the statement was true and added a paragraph in his own handwriting, stating, "I have read this whole statement and everything in it is true. There is nothing in this statement that is not true. I [have] been treated fairly and respectfully today as I spoke with Mr. Todd Dawson."

At trial, Mr. Hebah changed his story and testified he did not remember any of the events which occurred at the second house. He stated he did not believe he assaulted the girl or had sex with her and that the eye witnesses, including his friends, who testified he did sexually assault her were either lying, "jumping to conclusions," scared, or felt threatened. While he testified he did not tell Agent Dawson he had sex with the teenager, on cross-examination he admitted he told Agent Dawson he put his finger and penis in the teenager's vagina. He also

admitted he reviewed the confession, added the last paragraph in his own writing, and signed it, even though Agent Dawson told him to point out anything untrue in the confession. Following deliberations, the jury found Mr. Hebah guilty of one count of sexual abuse on an Indian Reservation, in violation of 18 U.S.C. §§ 1153 and 2242(2)(A) and (B), and the district court sentenced him to seventy-two months imprisonment.

## II. Government's Peremptory Strike of Jurors

During the jury selection process, one of the prospective jurors, who was a member of the Northern Arapaho Indian Tribe, stated she was a witness for her uncle during his federal trial for criminal sexual abuse, for which he was acquitted, and that one of the prosecutors in the instant case participated in her uncle's case "against us." When asked if being a witness for her uncle prejudiced her, she replied, "Kind of. I don't know." Although she stated she "could be fair," she also admitted her previous testimony may have prejudiced her "at that time," and when asked if she had any particular feelings about the federal government or the Federal Bureau of Investigation investigating cases on the reservation, she stated:

> No, except just during the time when it happened ... it was like a real bad experience and stuff. But [I] kind of got over it. ... You know, it was just like our family went through a lot and it was wrong, you know. I don't know. Kind of hard to talk about.

Finally, when asked if it would be hard for her knowing other families would go through the same thing, she stated, "Uh-huh, kind of, but I can try."

The government challenged the juror for cause, asking that she be excused, which the trial court denied, stating, "I feel that even though she did have [a] situation in the family, that [she] has said that she would be fair, and I think she regards this as a separate case." The government then used one of its peremptory challenges to strike the juror, to which Mr. Hebah's counsel raised a *Batson* challenge, stating the government could not strike the juror based on race. At a bench discussion with the judge, the government's counsel explained he participated in adjudicating the juror's uncle's case and that after the "not guilty" verdict, federal marshals broke up a "big fight" which erupted in the federal courtroom between the victim's and juror's families. He also explained officials escorted the victim and her family out the back door of the courthouse because the juror's family was waiting for her, and that it was an "extremely ugly and emotional thing." The trial court then overruled Mr. Hebah's *Batson* objection and dismissed the juror.

The next prospective juror, who was also a female member of the Northern Arapaho Indian Tribe, stated she experienced prejudice when her nephew "went

through some court stuff, too" and also admitted prior knowledge of the instant case, stating, "I kind of heard what happened to what is going on with this case. ... I work with [Mr. Hebah's] girlfriend's mother and she told me everything, so I don't know. I'm kind of like sitting on a balance." When the judge told her she could not consider anything she heard other than the evidence presented by the witnesses, she stated, "I don't know. It would be kind of hard, I would think, for me because I'm really close friends to her and then, I don't know, I just didn't agree with some of the stuff that they had told me about." When questioned on whether she could consider the government's proof, if it was beyond a reasonable doubt, over Mr. Hebah's presumption of innocence, she said she would "try," and when asked if her mind was made up, she noted she was close to Mr. Hebah's girlfriend's mother and "she did tell me a lot of what happened." She also stated she had a bad experience with the court system when her nephew was beaten, even though some of the perpetrators were found guilty and served time, and explained he was not treated fairly by the system and that she did not trust law enforcement or lawyers.

The government then asked the court to strike the juror for cause, given her statements on how she would evaluate evidence connected to law enforcement officials. The trial court explained to the juror that, as a juror, she would be

instructed the testimony of law enforcement officers would be considered the same as any other person, to which she stated, "I understand that." When the court asked her to promise she would not discount testimony merely because it was from law enforcement, she answered, "Yeah, yeah," turning her head away from the court and addressing the floor and finally stating, "I promise."

After the court denied the government's request for removal for cause, the government exercised a peremptory challenge to strike the juror, to which Mr. Hebah's counsel again raised a *Batson* challenge based on race. During the bench discussion, the court volunteered that the juror vacillated on her answers, and then agreed with government counsel that it had a reasonable basis for challenging her because she begrudgingly agreed she would try to treat law enforcement testimony the same as other testimony. While Mr. Hebah's counsel argued the juror said she would fairly assess the evidence, the court countered, "Yeah, but ... I had to drag it out of her." The court then concluded by stating the challenge was reasonable and denying Mr. Hebah's second *Batson* objection.

On appeal, Mr. Hebah argues the district court violated his constitutional rights, under *Batson v. Kentucky*, 476 U.S. 79 (1986), when it allowed the government to use its peremptory challenges to strike two Native Americans from

the jury. In rather summary fashion, Mr. Hebah suggests the government's claim the jurors were biased against the prosecution was "disingenuous" in light of the district court's earlier rulings not to remove the jurors for cause and the two jurors' statements they would be fair and impartial. Mr. Hebah then concludes the only basis for the jurors "to be excused by the United States was that they are Native American women."

We begin with our standard of review and the law applicable to *Batson* jury claims. "It is clear that defendant has the constitutional right to be tried by a jury whose members are selected by nondiscriminatory criteria," *United States v. Hartsfield*, 976 F.2d 1349, 1356 (10th Cir. 1992) (quotation marks and citation omitted), and that "[a] party's use of a peremptory challenge to exclude a juror based on the juror's race violates the United States Constitution," *United States v. Castorena-Jaime*, 285 F.3d 916, 927 (10th Cir. 2002) (relying on *Batson*, 476 U.S. at 89). In order to resolve objections to peremptory challenges, a three-step procedure is followed in which: (1) "the objector must make a prima facie showing that the peremptory challenge is based on race"; (2) if this burden is met, "the party striking the juror must articulate a race-neutral explanation for striking the juror"; and (3) "[i]f the court finds the striking party's reason is race neutral, the court must determine whether the objecting party has shown purposeful

-10-

discrimination." *Id.* at 927-28 (relying on *Batson*, 476 U.S. at 94-98). "The party objecting to the use of the peremptory challenge carries the ultimate burden of persuasion." *Id.* at 928. In addition, we have held that "'[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.'" *United States v. Sneed*, 34 F.3d 1570, 1579 (10th Cir. 1994) (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991)).

In reviewing *Batson*-type claims, we review *de novo* whether the striking party's explanation is race neutral, *Castorena-Jaime,* 285 F.3d at 927; *Sneed*, 34 F.3d at 1580, and "unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Sneed*, 34 F.3d at 1579 (quotation marks and citation omitted). We review the district court's finding of whether the striking party had discriminatory intent for clear error, affording great deference to its decision on discriminatory intent, which represents a finding of fact. *Castorena-Jaime,* 285 F.3d at 927; *Sneed*, 34 F.3d at 1579-80. We recognize that in making its determination, "the district court can consider whether the prosecutor's explanation is a mere pretext for race-based peremptory challenges," and its "findings on the issue of discriminatory intent

largely turn on an evaluation of the prosecutor's credibility." *Sneed*, 34 F.3d at 1579.

In this case, the issue of whether Mr. Hebah established a prima facie case of discrimination is moot, given the government gave a race-neutral explanation for the peremptory challenges of the two jurors, after which the district court ruled on Mr. Hebah's *Batson* objections concerning the question of intentional discrimination. Applying the applicable *de novo* standard of review, we conclude the government's counsel offered plausible race-neutral explanations for striking the jurors based on their apparent predisposed prejudice against the prosecution arising from past negative trial experiences. Even though Mr. Hebah contends both jurors stated they would be fair and impartial, it is clear neither juror would readily commit to objectively considering the government's evidence. We further reject Mr. Hebah's argument against the peremptory strikes of those jurors based on his contention the district court previously denied the government's request to excuse the same jurors for cause. Clearly, explanations for a peremptory strike do not need to rise to the same level of challenges for cause. *See Hernandez*, 500 U.S. at 362-63.

Having determined the government provided a legitimate, race-neutral

reason for exercising its peremptory strikes, we consider the district court's finding the government also had no discriminatory intent, as reflected by its decision to overrule Mr. Hebah's *Batson* objections.[1]  Applying our clear error standard of review and affording deference to the district court's credibility and discriminatory intent determinations, Mr. Hebah has not met his burden of persuasion in showing any error occurred.  Our decision on this issue is bolstered by the fact the government did not impose a peremptory strike against another Native American who served on the jury in this case, thereby helping to dispel an inferred pattern of discriminatory challenges by the government to strike Native American jurors based solely on race.  *See United States v. Willie*, 941 F.2d 1384, 1399 (10th Cir. 1991).  While peremptory strikes might result in a disproportionate removal of Native American jurors, that impact does not, *per se,* turn the prosecution's actions into a violation of the Constitution.  *See Hernandez*, 500 U.S. at 361.  Moreover, as the government points out, any inferred argument by Mr. Hebah that the low number of Native Americans serving on the jury prejudiced him is countered, in part, by the fact he himself used a peremptory strike to remove another Native American juror.

_____

[1] Despite our affirmation of the district court's summary rulings in this case, we continue to encourage district courts to make explicit factual findings on the record when ruling on *Batson* challenges, including statements on whether the proffered reason for the challenged strike is facially race neutral or inherently discriminatory, and why it chose to credit or discredit the given explanation.  *See Castorena-Jaime*, 285 F.3d at 929.

### III. *Allen* Instruction to Jury

Following closing arguments, the jury began deliberations at 3:50 p.m. and ended at 6:30 p.m. The next morning, it reconvened and deliberated another three hours before sending the district court a note signed by all twelve jurors stating, "What happens with a 'hung jury?' We are 6-guilty 6-not guilty and no one feels they can be swayed." The judge presented both counsel with a proposed *Allen* instruction and told them he would answer the jury's specific question by explaining, "if they remain deadlocked, it is necessary to declare a mistrial and that the case would have to be set for a second trial." Mr. Hebah's counsel objected to use of the *Allen* instruction because it included references to the cost of litigation, including the money, effort, and time expended in a second trial and also objected to the district court's reference to a new trial, arguing a new trial might not be imminent if the government decided against prosecuting the matter a second time. The district court overruled the objections and gave the jury the proposed *Allen* instruction, along with additional verbal instruction intended to answer the specific question posed. After receiving the *Allen* instruction, the jury deliberated just under two hours and returned a unanimous verdict of guilty.

On appeal, Mr. Hebah provides the entire text of the lengthy instruction,[2]

_____

[2]  While we determine the appropriateness of only those portions of the instruction which Mr. Hebah contests, we view them in the context of the entire instruction to the jury, which was as follows:

The Court wishes to suggest a few thoughts to you which you may consider in your deliberations. You should think about these concepts, along with the evidence received during the trial and all of the instructions previously given to you. This is an important case. The trial has required time, effort and money from both the defense and the prosecution. If you should fail to agree on a verdict, the case is left open and undecided. Like all cases, it must be resolved at some time.

There is no reason to believe that a second trial would not be costly to both sides. Nor does there appear any reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.

There is no reason to believe that more evidence or better evidence would be produced at a second trial. Any future jury would be selected in the same manner and from the same source as you were chosen.

So there appears no reason to believe that the case could ever be submitted to 12 people more conscientious, more impartial or more competent to decide.

These concepts are, of course, clear to all of us who have participated in this trial. The only reason I mention these facts now is because some of them may have escaped your attention while you have been fully occupied in reviewing the evidence in this case in the light of the instructions with your fellow jurors. These are all matters which remind us how desirable it is that you unanimously agree upon a verdict.

As stated in the instructions given at the time the case was first submitted to you for instruction, you should not surrender your honest beliefs as to the weight or effect of evidence solely because of the opinion of other jurors or for the mere purpose of returning a unanimous verdict.

However, it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but you should do so only after consideration of the evidence in the case with your fellow jurors. In the course of your deliberations you should not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.

In order to bring 12 minds to a unanimous result, you must examine the question submitted to you with candor and frankness and with proper deference to and conferring together, each of you should pay due attention and respect to the views of the others and listen to each other's arguments with a disposition to reexamine your own views.

If a greater majority of you are for a conviction, each dissenting juror ought to consider whether a doubt in his or her mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest and equally conscientious fellow jurors who bear the same responsibility, serve under the same oath, and have heard the same evidence, with, we may assume, the same attention and with an equal desire to arrive at the truth.

If, on the other hand, a majority or even a lesser number of you are for acquittal, other jurors ought to seriously ask themselves again and most thoughtfully whether they do not have a reason to doubt the correctness of the judgment which is not concurred in by so many of their fellow jurors beyond a reasonable doubt.

As I've told you before, you're not partisans. You're judges. You're judges of the facts of this case. Your sole interest here is to determine whether the Government has proven each essential element of the charge concerning the defendant beyond a reasonable doubt.

You are the exclusive judges of the credibility of all of the witnesses and of the weight and effect of the evidence. Remember at all times that no juror is expected to yield a conscientious belief he or she may have as to the weight or effect of evidence. But remember also that after full deliberation and consideration of all of the evidence in the case, it is your duty to agree

upon a verdict if you can do so without yielding–without violating, rather, your individual judgment and your conscience.

Remember, too, if the evidence in the case fails to establish guilt beyond a reasonable doubt, the defendant should have your unanimous verdict of not guilty.

In order to make a decision more practicable, the law imposes the burden of proof on one party or the other in all cases. And in a criminal case, the burden of proof is upon the Government. Above all, keep constantly in mind that unless your final, conscious appraisal of the evidence in the case clearly requires it, the defendant should never be exposed to the risk of having to twice run the gauntlet of criminal prosecution and to endure a second time the mental, emotional and financial strain of a criminal trial.

You may conduct your deliberations as you choose, of course, but I suggest that you now carefully reexamine and reconsider all of the evidence in the case bearing upon the questions before you in the light of the Court's instructions on the law. You may be as leisurely in your deliberations as the occasion may require, and you may take all of the time this afternoon that you feel is necessary.

And you may now retire and continue your deliberations in such manner as shall be determined by your good and conscientious judgment as reasonable men and women.

Now, I really didn't directly answer your question which was what happens with a hung jury. It is implied in the instruction, a copy of which will go to the jury room with you.

If the jury becomes hopelessly deadlocked and the Court so concludes, the Court will then declare a mistrial in this case and that means that the defendant has not then been placed in jeopardy. We have a concept of what is called a double jeopardy. A person can't be placed in double jeopardy. So then the case is rescheduled for a second trial at the convenience of the Court. And I don't know what my schedule or docket is for the next three or four months, but we would have to fit it in someplace

but fails to point to the specific portion of the instruction to which he objects, stating only that the instruction inappropriately referred to the importance of reaching a verdict and the costs incurred with a second trial. Assumably, he is referring to portions of the first and last parts of the instruction, which state:

> This is an important case. The trial has required time, effort and money from both the defense and the prosecution.
>
> There is no reason to believe that a second trial would not be costly to both sides.
>
> ....
>
> ... Above all, keep constantly in mind that unless your final, conscious appraisal of the evidence in the case clearly requires it, the defendant should never be exposed to the risk of having to twice run the gauntlet of criminal prosecution and to endure a second time the mental, emotional and financial strain of a criminal trial.

Mr. Hebah also argues the district court erred by limiting the time for jury deliberations to only one afternoon, by stating to the jury:

> You may conduct your deliberations as you choose, of course, but I suggest that you now carefully reexamine and reconsider all of the evidence in the case bearing upon the questions before you in the light of the Court's instructions on the law. You may be as leisurely in your deliberations as the occasion may require, *and you may take all of the time this afternoon that you feel is necessary*.

(Emphasis added.) Next, he contests the district court's verbal instruction

---

there. So that's the best I can tell you.

addressing the jurors' specific question, in which it stated:

> Now, I really didn't directly answer your question which was what happens with a hung jury. It is implied in the instruction, a copy of which will go to the jury room with you.
>
> If the jury becomes hopelessly deadlocked and the Court so concludes, the Court will then declare a mistrial in this case and that means that the defendant has not then been placed in jeopardy. We have a concept of what is called a double jeopardy. A person can't be placed in double jeopardy. So then the case is rescheduled for a second trial at the convenience of the Court. And I don't know what my schedule or docket is for the next three or four months, but we would have to fit it in someplace there. So, that's the best I can tell you.

He suggests the district court's comments on rescheduling for a second trial "unquestionably put the jury in the difficult position of 'inconveniencing' the court if they were unable to reach a verdict," and its comments on double jeopardy were confusing and "improperly place[d] a legal burden upon the jury, ... i.e., reflecting on the concept of double jeopardy and the effect of a mistrial upon that right." Mr. Hebah also contends the timing of the *Allen* instruction, which was not included with the other jury instructions, caused the jury to view it in isolation, increasing the possibility of coercion; the district court's coerciveness is evidenced by the fact the jury reached its verdict only two hours after receiving the *Allen* instruction;[3] and the district court's verbal statements laid a "guilt trip"

_____

[3] Mr. Hebah did not raise some of these contentions at the trial level, including issues related to the *Allen* instruction not being given with other instructions, the jury arriving at its verdict only two hours after receiving that instruction, and the district court

on the jury.

An *Allen* instruction derives its name from jury instructions approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492 (1896), and it is used for the purpose of encouraging:

> unanimity (without infringement upon the conscientious views of each individual juror) by urging each juror to review and reconsider the evidence in the light of the views expressed by other jurors, in a manner evincing a conscientious search for truth rather than a dogged determination to have one's own way in the outcome of the deliberative process.

*United States v. Smith*, 857 F.2d 682, 683-84 (10th Cir. 1988). A modified Allen instruction, like the one used here, is one directed to all the members of the jury, not just those in the minority view. *United States v. Alcorn*, 329 F.3d 759, 766 (10th Cir. 2003). This court has long sanctioned the use of a modified *Allen* instruction, while also traditionally urging caution in its use. *Id.* at 766; *Gilbert v. Mullin*, 302 F.3d 1166, 1173 (10th Cir. 2002). We review an *Allen* instruction "in its context and under all the circumstances," *Gilbert*, 302 F.3d at 1173,

---

improperly limiting the time for their deliberations and instructing them on double jeopardy. Given these issues were not raised before the district court, we may review them for plain error. *See United States v. Hernandez-Garcia*, 901 F.2d 875, 876 (10th Cir. 1990). Plain error in the context of an *Allen* instruction involves an error that "affects the defendant's fundamental right to a fair and impartial trial." *Id.* at 876 (quotation marks, alteration, and citation omitted). In any event, in this case, regardless of whether we apply either a plain or harmless error standard of review, we reject Mr. Hebah's contentions.

considering whether it "was erroneously given on a case-by-case basis with a view towards determining whether the instruction had a coercive effect on the jury." *United States v. Rodriguez-Mejia*, 20 F.3d 1090, 1091 (10th Cir. 1994). Whether an *Allen* instruction was improperly coercive is a mixed question of law and fact. *Gilbert*, 302 F.3d at 1171. In determining whether the *Allen* instruction was coercive, we consider: (1) the language of the instruction; (2) its incorporation with other instructions; (3) the timing of the instruction; and (4) the length of the jury's subsequent deliberations. *See id.* at 1173.

First, with respect to the language of the *Allen* instruction, we reject Mr. Hebah's objection to selected portions of the instruction. When included with the language directed at the entire jury and cautioning no juror to surrender his or her conscientious conviction, this court has approved the same or similar language contested by Mr. Hebah that "[t]his is an important case," *see Gilbert*, 302 F.3d at 1172; *United States v. Reed*, 61 F.3d 803, 805 n.5 (10th Cir. 1995); *United States v. McKinney*, 822 F.2d 946, 950 n.2 (10th Cir. 1987), and the trial has required "time, effort and money to both the defense and the prosecution," *see Reed*, 61 F.3d at 805 n.5; *United States v. Ellzey*, 936 F.2d 492, 499 n.1, 501 n.2 (10th Cir. 1991).

Similarly, in viewing the instruction as a whole, we have sanctioned the use of language that another or second trial would be costly to both sides, *see Reed*, 61 F.3d at 805 n.5, and a like reference to the "mental, emotional and financial strain" of a second trial, *see, e.g., United States v. Arney*, 248 F.3d 984, 987-88 n.3 (10th Cir. 2001) (considering instruction, which included statement "[y]our failure to agree upon a verdict will necessitate another trial and require the parties once again to undergo the investment of time and effort and the stress of trial"); *Smith*, 857 F.2d at 684 (considering italicized words in instruction statement, explaining, "If you fail to reach a verdict, the parties *will* be put to the expense of another trial and *will* once again have to endure the mental and emotional strain of a trial.").[4]

Applying the requisite standard of review, and considering the contested language in view of the entire *Allen* instruction given, we find no coerciveness in its use. The instruction as a whole was "evenhanded, it did not presume that the majority favored a guilty verdict; and it emphasized that no juror was expected to yield a conscientious conviction on the evidence." *Reed*, 61 F.3d at 805.

---

[4] It does not appear Mr. Hebah is specifically renewing his trial objection that the *Allen* instruction inappropriately mentioned a new trial given the government might decide not to prosecute. Even if we consider his objection, we reject it, noting we have rejected similar claims before. *See Hernandez-Garcia*, 901 F.2d at 876-77; *Smith*, 857 F.2d at 682, 685.

With respect to the time the instruction was tendered, we have stated a preference to tender an *Allen* instruction at the same time as other instructions, but it is not, *per se,* error to tender such an instruction after deliberations have begun and the jury notifies the court it is having trouble reaching a unanimous verdict. *See Arney*, 248 F.3d at 989; *Rodriguez-Mejia*, 20 F.3d at 1092. Similarly, with regard to the amount of time the jury deliberated after receiving the *Allen* instruction in this case, it deliberated just under two hours before arriving at a unanimous verdict. We find this fact, in consideration with all the circumstances presented, is not determinative of coerciveness, and in so doing, point out this court has upheld guilty verdicts arrived at in less time after receiving an *Allen* instruction which, like here, did not contain coercive or otherwise faulty language. *See, e.g., Arney*, 248 F.3d at 987, 990 (upholding guilty verdict in as little as one hour after receiving the instruction); *Ellzey*, 936 F.2d at 501 n.2 (upholding verdict rendered approximately one and one-half hours after *Allen* instruction tendered). *But see United States v. McElhiney*, 275 F.3d 928, 946 (10th Cir. 2001) (finding of coerciveness in circumstance where, in part, instruction was defective and jury reached a unanimous verdict within as little as one hour and thirty minutes after instruction was tendered).

Finally, we consider Mr. Hebah's contentions the district court improperly

gave verbal instructions which: (1) limited the jury's deliberation time to only that afternoon; (2) made the jury feel it would inconvenience the court if a mistrial occurred; (3) placed the legal burden on the jury in its reference to "double jeopardy"; and (4) otherwise laid a "guilt trip" on them. To begin, we find no error in the district court's disputed verbal comment to jurors "[y]ou may be as leisurely in your deliberations as the occasion may require, *and you may take all of the time this afternoon that you feel is necessary*." (Emphasis added.) Given the written *Allen* instruction contained only the statement "[y]ou may be as leisurely in your deliberations as the occasion may require and you may take all the time which you feel is necessary," and the district court likewise informed the jurors they could leisurely deliberate, we do not believe the district court's additional verbal comment for the jurors to "take all of the time this afternoon that you feel is necessary," would coerce a jury to reach a verdict by the end of that afternoon without regard to the instruction's explicit cautions that no juror should yield a conscientious conviction on the evidence. Our decision is buttressed by the fact the jury arrived at its verdict at 2:10 p.m., well before the afternoon ended, so the jurors could have taken more time if necessary, even if they somehow believed they only had that afternoon to reach a decision.

As to Mr. Hebah's contention the district court improperly remarked on the

issue of "double jeopardy" and therefore inappropriately placed a legal burden on the jury, we believe the remark was fairly generic and did not impose any such burden. Given the remark followed the *Allen* instruction, and was therefore given in context with an instruction not requiring any deliberation on the concept of "double jeopardy," we do not believe the reference to "double jeopardy" in this case caused any coerciveness, or even any confusion. Next, the district court judge's verbal comment concerning his upcoming trial schedule would not likely cause a juror to forfeit his or her own conviction just for the convenience of the court, especially since the *Allen* instruction thoroughly explained and emphasized that no juror should yield his or her conscientious conviction on the evidence. As to Mr. Hebah's statement the district court laid a "guilt trip" on the jury, the appropriate standard in which we view arguments related to *Allen* instructions is for coerciveness. Under the circumstances as a whole, viewing the record together with the *Allen* instruction given by the district court and any verbal comments accompanying it, the record does not indicate, and Mr. Hebah has not shown, the district court coerced the jury into the verdict rendered.

## IV. Exclusion of Defendant's Expert Witness

Prior to trial, Mr. Hebah gave notice he would offer the testimony of a clinical and forensic psychologist, Dr. William E. Flynn, who would testify on

Mr. Hebah's proneness to give false confessions based on his overly compliant nature and tendency to acquiesce to the wishes of others, including Agent Dawson, who received Mr. Hebah's confession. After the government objected, the district court held a lengthy *Daubert*-type hearing in chambers where Dr. Flynn explained what his court testimony would entail.

In part, the following was established: (1) Dr. Flynn's resume' failed to establish he possessed any expertise in the area of false confessions, and specifically omitted any reference to his training, research, or published articles on the topic; (2) he "guessed" he attended a one-day workshop three or four years earlier on the admission of tests relating to false confessions; (3) he administered false confession tests only five to ten times before; (4) he relied on Mr. Hebah's relatives to verify his compliance results; (5) he tested Mr. Hebah and his relatives by sending them tests or questionnaires in advance and then interviewing them over the telephone, and admitted the reliability of their answers might depend on the reliability of those in the room with them or whoever handled or helped with the tests; (6) Mr. Hebah's and his relatives' answers could be self-serving or based on lies, and the test used could not identify whether they were malingering; (7) he incorrectly switched or confused the error rate for two tests and was unable to satisfactorily establish an error rate for the tests he

administered; (8) he did not know if Mr. Hebah was compliant or a false confessor, although he previously provided a written evaluation stating he was both compliant and a false confessor; (9) he himself did not give Mr. Hebah the Kaufman Brief Test he used to test his intelligence; (10) the false confession studies he relied on were British and Icelandic based; and (11) confession testing may be too meager to qualify as scientific knowledge under the *Daubert* standard.

When questioning Dr. Flynn, the government relied on various articles suggesting the false confession defense, developed in Great Britain and applied by Dr. Flynn, was unused in American courts based on the fact British law does not have a *Miranda* equivalent, including the right to remain silent, or an exclusionary rule to suppress evidence. While Dr. Flynn admitted he did not consider these differences in his evaluation or conclusions, he testified that he guessed half of the states in the country accept this type of testimony. The district court judge took exception with this remark, pointing out he and his clerk researched the issue for three days and found very few cases on the subject. After articulating its findings of fact and reasons for rejecting admission of Dr. Flynn's testimony, the district court sustained the government's objection.

On appeal, Mr. Hebah claims his confession was the strongest evidence

implicating him in the sexual abuse for which he was convicted, and therefore the district court "completely gutted" and prejudiced his defense by refusing to allow his expert witness to testify on the subject of false confessions. In rather summary fashion, Mr. Hebah focuses on the relevance of Dr. Flynn's testimony, rather than any discussion on its reliability. He contends Dr. Flynn's tests were relevant because they revealed he possessed low intelligence and experienced abnormal susceptibility to accepting the suggestions of others and complying with their requests, including the influence of Agent Dawson, who improperly persuaded him to confess to sexually abusing the teenage girl. Finally, Mr. Hebah contends the district court failed to follow the specific factors outlined in *Daubert* when it excluded his expert's testimony.

We begin by considering the rules and law applicable to the admission of expert witness testimony, together with our standard of review for exclusion of such evidence. The applicable rule on expert testimony, Federal Rule of Evidence 702, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589-91 (1993), the Supreme Court explained Federal Rule of Evidence 702 requires the district court to ensure all scientific testimony or evidence admitted at trial is (1) relevant, and (2) reliable. *See also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005). Reliability is determined by examining "whether the reasoning or methodology underlying the testimony is scientifically valid," and relevance is based on "whether reasoning or methodology properly can be applied to the facts in issue," *McKenzie v. Benton*, 388 F.3d 1342, 1351 (10th Cir 2004) (quotation marks and citations omitted), *cert. denied*, 125 S. Ct. 2294 (2005), or the "task at hand," *Norris*, 397 F.3d at 884.

The *Daubert* Court set out several factors which may be considered by a district court, including whether: (1) the technique can and has been tested; (2) the opinion has been subjected to peer review; (3) there is a known or potential error rate associated with the methodology used and the standards controlling the technique's operation; (4) standards controlling the technique's operation exist and are maintained; and (5) the theory has been accepted in the scientific community. *Norris*, 397 F.3d at 884; *United States v. Call*, 129 F.3d 1402, 1404 (10th Cir. 1997). Since its decision in *Daubert*, the Supreme Court has emphasized that no particular formula should be applied in determining if expert

testimony is reliable and relevant, and that the *Daubert* list is neither definitive nor exhaustive. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999); *Norris*, 397 F.3d at 884. In addition, this court has long held the "voluntariness" or "credibility" of a confession "'is generally not an appropriate subject for expert testimony,'" in part, because it "encroaches upon the jury's vital and exclusive function to make credibility determinations." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001) (citations omitted).

With respect to our standard of review, we review *de novo* whether the district court properly performed its "gatekeeper" role under Federal Rule of Evidence 702 and *Daubert*. *Norris*, 397 F.3d at 883. We review for an abuse of discretion whether the district court properly excluded expert testimony in performing that function. *Id.* "We will not disturb the district court's ruling unless it is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotation marks, alteration, and citation omitted).

In this case, the district court clearly considered Rule 702, the *Daubert* factors, and other issues related to Dr. Flynn's testimony, and made extensive

findings that: (1) Dr. Flynn lacked training in the area on which he planned to testify, and a one-day seminar did not otherwise qualify him to testify; (2) his procedures had not been shown to be reliable; (3) his use of Mr. Hebah's relatives to validate the test results was an unreliable way of testing for malingering; (4) he improperly applied a "shortcut" process rather than used standard psychological tests such as the MMPI; (5) he failed to use real or standard IQ tests, performed under strict testing conditions, and instead used the Kaufman Brief Test; (6) his evaluation process is one not generally accepted in our judicial system, most likely because it was developed in Great Britain, which has a different criminal justice system; (7) he failed to established to the court's satisfaction any error rate in the process used; and (8) his testimony was irrelevant, given it would not materially assist the jury and could infringe on the jury's credibility determinations of Mr. Hebah and Agent Dawson.

We have considered the district court's factual determinations, which are clearly supported by the record, and after applying the appropriate standard of review on appeal we conclude it did not abuse its discretion or otherwise err in disallowing the admission of the expert's testimony based on its finding it was unreliable. Because we agree Dr. Flynn's testimony failed the *Daubert* reliability requirement, we need not address the issue of whether it was relevant. *See*

*Norris,* 397 F.3d at 884.

Even if the district court erred in disallowing such testimony, the district court's failure to admit Dr. Flynn's testimony is, at worst, harmless.[5]  In this case, several individuals attended the party, witnessed Mr. Hebah's actions with respect to the teenager, and gave consistent accounts of what happened.  Their trial testimony, together with both Agent Dawson's and Mr. Hebah's trial testimony that he told Agent Dawson he put his finger and penis in the girl's vagina, sufficiently corroborated Mr. Hebah's confession for the purpose of supporting his conviction for sexual abuse.  In convicting him, it is evident the jury assessed the credibility of all the witnesses, including Mr. Hebah, and rejected his contention his confession did not contain a true account of his statements to Agent Dawson.  As a consequence, we believe the omission of Dr. Flynn's testimony did not affect Mr. Hebah's substantial rights; in other words, its omission did not substantially influence the outcome or leave us in grave doubt as to whether it had such an effect.  *See Turner*, 285 F.3d at 914.

---

[5]  "[A]n error is harmless unless a substantial right of a party is affected," and therefore, "an error affecting a substantial right of a party is an error which had a substantial influence on the outcome or which leaves one in grave doubt as to whether it had such effect." *See United States v. Turner*, 285 F.3d 909, 914 (10th Cir. 2002) (quotation marks and citations omitted).

## V.  Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Hebah's conviction and sentence.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge