**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 24, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RICHARD ALLEN JOHNSON,

    Defendant-Appellant.

No. 04-7049

(D.C. No. CR-03-60-WH)
(E. D. Oklahoma)

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ANTHONY ALLEN PERKINS,

    Defendant-Appellant.

No. 04-7050

(D.C. No. CR-03-60-WH)
(E. D. Oklahoma)

_____

UNITED STATES OF AMERICA

    Plaintiff-Appellee,

v.

JIMMIE ALLEN PERKINS,

    Defendant-Appellant

No. 04-7054

(D.C. No. CR-03-60-WH)
(E. D. Oklahoma)

---

**ORDER AND JUDGMENT**[*]

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under

Before **BRISCOE, McKAY,** and **SEYMOUR**, Circuit Judges.

Defendants Richard Johnson, Jimmie Perkins, and Anthony Perkins were convicted of various criminal counts arising out of an armed bank robbery and sentenced to lengthy terms of imprisonment. Defendant Johnson now appeals his convictions and sentence. Jimmie and Anthony Perkins appeal only their sentences. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm defendant Johnson's convictions but remand his case to the district court for resentencing. We likewise remand defendant Jimmie Perkins' case to the district court for resentencing. We affirm defendant Anthony Perkins' sentence.

I.

On the afternoon of March 31, 2003, two men wearing camouflage clothing and masks broke into the home of Lowell and Ima Jean Moore located outside of Keota, Oklahoma. When Mr. Moore, who was disabled, returned home from fishing, he was confronted by the men and ordered, at gunpoint, to comply with their demands. Mrs. Moore, who worked at the Keota branch of the First National Bank of Stigler (hereinafter the Keota branch bank), received similar treatment when she returned home that afternoon from work. The masked men proceeded to question the Moores about the

the terms and conditions of 10th Cir. R. 36.3.

Keota branch bank and indicated that they intended to rob it, threatened to kill the Moores if they did not cooperate, threatened to rape Mrs. Moore, and at one point took steps towards actually raping Mrs. Moore (i.e., ordering her to remove her pants and then unbuttoning and unzipping her pants when she refused to cooperate). At approximately 9:30 p.m. that evening, a third man wearing camouflage clothing and a mask arrived at the Moores' house, stayed for approximately forty-five minutes to an hour, and then left with firearms taken from the bedroom of Mrs. Moore's son. After the third man left the house, the remaining two masked men escorted the Moores to their bedroom and told them they could lay down.

At approximately 4:00 a.m. the next morning, the masked men ordered the Moores out of bed and escorted them outside and into a white van owned by the Moores. The masked men drove the Moores approximately two miles from their home, blindfolded them, and proceeded to drive around for a long period of time, making numerous turns and stopping twice, once to meet up with another vehicle and a second time during which Mrs. Moore was removed by the masked men, interrogated again about the Keota branch bank, and advised of what her role would be in the robbery of the bank. Eventually, the masked men removed the blindfolds from the Moores, ordered Mr. Moore to drive the van, and directed him to the Keota branch bank.

At the Keota branch bank, one of the masked men remained in the van with Mr. Moore while the other escorted Mrs. Moore, who had keys to the bank, inside. In accordance with the masked man's directions, Mrs. Moore turned off the bank's alarm

system and video camera, and then opened the bank's vault.  The masked man removed a bag of money from the vault (totaling $29,300), left the bank with Mrs. Moore, and returned to the van.  Mr. Moore was then ordered to drive as fast as he could out into the country.  Outside of Keota on a country road, the masked men ordered the Moores out of the van and directed them to "walk west and don't look back."  Supp. Vol. II, at 11.  The Moores walked to a nearby house where they called law enforcement authorities.  The Moores' van was subsequently found abandoned outside of Keota.

On April 25, 2003, a criminal complaint was filed charging Johnson and Jimmie Perkins with robbing the Keota branch bank, in violation of 18 U.S.C. § 2113(a).  ROA, Vol. I, Doc. 1.  Both men were arrested that same day.  During a post-arrest interview with the Federal Bureau of Investigation (FBI), Jimmie Perkins admitted his involvement in the robbery, but asserted that he was forced to participate, under threat of physical harm to himself and his family, by a group of Mexican men.  When questioned about Johnson's involvement in the robbery, Jimmie Perkins refused to say whether Johnson was involved or not.

On June 11, 2003, a federal grand jury returned an eight-count indictment charging Johnson, Jimmie Perkins, and Anthony Perkins (Jimmie Perkins' son) with various crimes arising out of the robbery of the Keota branch bank.  ROA, Vol. I, Doc. 8.  Count I charged the defendants with conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371.  Count II charged the defendants with armed bank robbery in violation of 18 U.S.C. § 2113(a) and (c).  Count III charged the defendants with hostage taking in

-4-

violation of 18 U.S.C. § 1203.[1]  Count IV charged Johnson and Jimmie Perkins with possession of a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c).  Counts V and VI charged Johnson with solicitation to commit a crime of violence in violation of 18 U.S.C. § 373.  Count VII charged Johnson and Jimmie Perkins with possession of stolen firearms in violation of 18 U.S.C. § 924(l).  Finally, Count VIII charged all three defendants with conspiracy to possess a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(o).

The case proceeded to trial on December 17, 2003.  At the conclusion of the evidence, the jury found the three defendants guilty as charged in the indictment.  With respect to defendants Johnson and Jimmie Perkins, the jury also found, in response to a special interrogatory, that they brandished weapons during and in relation to Count IV of the indictment (i.e., the § 924(c)) charge.

On May 12, 2004, the district court conducted a joint sentencing hearing for the three defendants.  At the government's request, the district court determined it would depart upward in two respects as regards the sentences of defendants Johnson and Jimmie Perkins.  First, the district court concluded that their § 924(c) convictions effectively skewed their Guideline ranges lower than they would have been had they not been convicted under § 924(c).  In other words, the district court concluded that the sentences for Johnson and Jimmie Perkins "under the Guidelines for violation of Sections 2113(a) and 924(c) might be less severe than had they been convicted of violating only Section

_____

[1] This count was later dismissed by the government.  ROA, Vol. II, Doc. 96.

2113(a) with an enhancement for using a firearm . . . ."  ROA, Supp. Vol. I, at 78.  Thus,

in accordance with Application Note 4 to § 2K2.4 of the Sentencing Guidelines[2], the

district court chose to calculate Guideline ranges for these two defendants by treating

them as if they had not been convicted of violating § 924(c) (and thus in turn enhancing

their offense levels for using a firearm during and in relation to the bank robbery).  This

resulted in an offense level of 38 for Johnson and 36 for Jimmie Perkins, and in turn a

Guideline range of 235 to 293 months for Johnson and 188 to 235 months for Jimmie

Perkins.[3]

---

[2] Application Note 4 to U.S.S.G. § 2K2.4 provides, in pertinent part, as follows: In a few cases in which the defendant is determined not to be a career offender, the offense level for the underlying offense determined under the preceding paragraphs may result in a guideline range that, when combined with the mandatory consecutive sentence under 18 U.S.C. § 844(h), § 924(c), or § 929(a), produces a total maximum penalty that is less that the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a) (i.e., the guideline range that would have resulted if the enhancements for possession, use, or discharge of a firearm had been applied).  In such a case, an upward departure may be warranted so that the conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a) does not result in a decrease in the total punishment.  An upward departure under this paragraph shall not exceed the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a).

[3] The government, in its motion for alternative sentencing calculations and upward departure, argued in part that "the starting point for all defendants" should be the "total offense level of 36 [and the] corresponding sentencing range of 188 to 235 months" that was arrived at under the Guidelines for defendant Anthony Perkins.  ROA, Vol. II, Doc. 105, at 4.  At the sentencing hearing, the district court expressed "surprise[] that Mr. Anthony Perkins' range was higher than that [initially calculated for] Mr. Johnson and Mr. Jimmie Perkins," but emphasized it was "not using that as a basis in [its] considerations for . . . using the alternative sentencing range . . . ."  ROA, Supp. Vol. I, at

Second, the district court found "by a preponderance of the evidence that the combination of the sophistication of the robbery, the duration of the abduction, the use of multiple firearms and making multiple and repeated threats of death to multiple victims, and the sexual assault of Mrs. Moore [we]re aggravating factors present to a degree not adequately considered by the Sentencing Commission in formulating the Guidelines," which in turn caused the case "to differ significantly from the heartland cases covered by the guidelines." Id. at 81. Thus, the district court departed upward by imposing a two-level enhancement to the offense levels of defendants Johnson and Jimmie Perkins.

Ultimately, the district court sentenced the three defendants in the following manner. With respect to defendant Johnson, who the district court found was the leader or organizer of the robbery, the district court imposed a sentence of 324 months, in the middle of Johnson's guideline range of 292 to 365 months. With respect to defendant Jimmie Perkins, the district court imposed a sentence of 293 months, a sentence at the very top of the guideline range of 235 to 293 months. Finally, with respect to defendant Anthony Perkins, the district court imposed a sentence of 188 months, a sentence at the bottom of the guideline range.

## II.

### *Denial of motion to suppress*

On April 25, 2003 (the same day defendant Johnson was charged in this case and arrested), special agent John Fitzer of the FBI applied for and received a search warrant

---

34.

for defendant Johnson's residence.  Attached to the warrant was a document, Attachment

B, listing the following "ITEMS TO BE SEIZED":

1. Any and all rifles, pistols or revolvers, including, but not limited to:
- Marlin Model 15Y rifle        serial number 16732058
- Snake Charmer 410 shotgun     serial number 54516
- Astra 9mm 475 handgun        serial number 071D
- Smith & Wesson 22 caliber
  semi-automatic pistol             unknown
2. Any and all sums of U.S. Currency and containers
3. Any and all ski mask or face coverings
4. Any and all black gloves or work-type gloves with exterior writing on them
5. Any and all camouflaged pants and/or shirts (common military battle dress uniform pattern)
6. Any and all combat-style boots
7. Any and all diaries, daytimers, calendars or address books
8. Any and all banking documents and records to include, but not limited to, account statements and transcripts, account credit and debit memos, and documents reflecting the deposit, transfer, withdrawal, sale, purchase, loan or other disposition of any asset held in an account
9. Any and all hand-held two-way radios
10. Any and all bank bags and/or money bands
11. Any and all portable recording devices and/or storage media of any type or size
12. Cellular phone and any and all associated records

ROA, Vol. I, Doc. 2, Att. B.

The warrant was executed later that evening, and completed the following

afternoon, April 26, 2003.  Although Fitzer was not present during most of the search, he

prepared the return that was filed after the warrant's execution.  The return listed the

following items that were not specifically listed in the warrant: "camouflage bag; four

Michelob beer bottles (two recovered from trash found in trailer on [Johnson's] property,

one recovered from camouflage bag, one recovered from bed of truck); binoculars; car

-8-

tag; owner's manual to riding lawn mower; two newspaper clippings; camera; shotguns that were not particularized in the warrant; miscellaneous receipts; 2003 taxes; black gloves (recovered from camouflage bag); one brown glove; and six and one-half pair of gloves." ROA, Vol. I, Doc. 39, at 3.

On June 30, 2003, Johnson moved to suppress all evidence seized during the search of his residence. In support of his motion, Johnson argued that the officers executing the warrant flagrantly disregarded the terms of the warrant in violation of the Fourth Amendment. The magistrate judge conducted an evidentiary hearing on Johnson's motion, and subsequently issued a report and recommendation recommending that Johnson's motion be granted in part and denied in part. In doing so, the magistrate judge began by noting "there [wa]s no suggestion that the officers [executing the search warrant] attempted to seize 'anything of [evidentiary] value' or otherwise attempted to transform the search warrant into a general warrant." ROA, Vol. 1, Doc. 39, at 4. Further, the magistrate judge found "that the executing officers" did not "exhibit[] such flagrant disregard for the terms of the search warrant as would require the extraordinary remedy of suppression of all the items seized thereunder." Id. at 4. Thus, the magistrate judge proceeded to review, on an individual basis, the items that were seized but not specifically mentioned in the search warrant. Id. In doing so, the magistrate judge concluded "that any gloves or firearms were properly seized under the search warrant . . . because they were within the ambit of items that were specifically mentioned in the warrant." Id. at 4-5. The magistrate judge also concluded that the camouflage bag and a

Michelob beer bottle contained therein were properly seized under the plain view rule. Id. at 6. In reaching this conclusion, the magistrate judge noted that "Agent Fitzer testified that" these items were seized "because the Moores reported that the kidnappers had drunk Michelob beer and used a bag to carry away the bottles and other discarded items . . . ."[4] Id. Further, the magistrate judge found that the officers discovered camouflage clothing, which was specifically listed in the search warrant, inside the camouflage bag. Id. Thus, the magistrate judge concluded the officers "had a legitimate reason for searching the camouflage bag." Id. at 7.

In contrast, the magistrate judge concluded that the newspaper clippings, the camera, the miscellaneous receipts, paperwork relating to Johnson's 2003 taxes, and a set of binoculars were not within the ambit of the items specifically mentioned in the search warrant and thus should be suppressed. Further, the magistrate judge concluded that three additional Michelob beer bottles seized during the search (one from the bed of Johnson's truck and two from a trash can inside Johnson's residence) were not listed in the search warrant and thus should be suppressed.[5]

On September 9, 2003, the district court issued an order adopting the magistrate judge's report and recommendation and granting in part and denying in part Johnson's

---

[4] At trial, the Moores testified that their abductors brought bottles of Michelob beer into the house and drank them over the course of the afternoon and evening prior to the robbery.

[5] The government admitted that the car tag and the owner's manual to the riding lawnmower were erroneously seized and voluntarily returned those items to Johnson. Id. at 5, n. 2.

motion to suppress.

On appeal, defendant Johnson contends the district court erred in denying his motion to suppress evidence seized during a search of his home. In reviewing the district court's decision, we "view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." United States v. Katoa, 379 F.3d 1203, 1205 (10th Cir. 2004).

Johnson begins his arguments by asserting, as he did below, that the officers executing the search warrant exhibited "flagrant disregard for its terms," and thus all the evidence seized during the search should be suppressed. Johnson Br. at 10. "[W]hen law enforcement officers grossly exceed the scope of a search warrant in *seizing* property, the [Fourth Amendment's] particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of *all evidence* seized under that warrant." United States v. Foster, 100 F.3d 846, 849-50 (10th Cir. 1996) (internal quotation marks omitted; italics in original). Here, the magistrate judge found, and the district court agreed, that the officers executing the search warrant at Johnson's residence did not grossly exceed the scope of the search warrant. Although Johnson purports to challenge this finding, he points to no evidence in the record that undermines the finding or that would support a contrary finding. Indeed, the only evidence in the record concerning the search is the warrant itself, the return completed by agent Fitzer, and Fitzer's testimony from the suppression hearing. That evidence clearly indicates that,

although the officers executing the warrant may have seized a few items that were not specifically listed in Attachment B to the warrant, they offered specific reasons for doing so and otherwise complied with the terms of the warrant. Thus, this case differs dramatically from Foster, where the executing officers admitted simply taking "anything of value" and ignoring the specific terms of the search warrant. 100 F.3d at 850.

Alternatively, Johnson argues that the district court should have suppressed those particular items of seized evidence that were not specifically listed in Attachment B to the search warrant. In this regard, Johnson first argues that a "Shotgun model S13" seized by the officers should be suppressed because (a) Attachment B listed a "Snake Charmer 410 shotgun" but not a "Shotgun model S13," (b) the shotgun at issue did not fall within the general category of "[a]ny and all rifles, pistols or revolvers" listed in Attachment B, and (c) the plain view exception could not support the seizure of the shotgun. Although the first and last of these arguments appear to be correct, the magistrate judge and district court concluded that the seized shotgun fell "within the ambit" of items listed in Attachment B, and thus was properly seized. ROA, Vol. I, Doc. 39, at 5. In other words, the magistrate judge and district court concluded that the executing officers could reasonably have interpreted the phrase "[a]ny and all rifles, pistols or revolvers" as encompassing shotguns. We agree. Even though there are technical differences between rifles and shotguns, Attachment B specifically listed several firearms, including a "Snake Charmer 410 shotgun," that fell within the scope of the phrase "[a]ny and all rifles, pistols or revolvers." In other words, Attachment B itself effectively defined the phrase "[a]ny

-12-

and all rifles, pistols or revolvers" to include shotguns. Thus, we agree with the district court that the seized shotgun fell within the scope of the items listed in Attachment B to the search warrant.

Johnson next argues that various gloves seized from his residence did not fall within the scope of the search warrant because they did not, as required by Attachment B to the warrant, have "exterior writing on them." As previously noted, Attachment B to the warrant listed "[a]ny and all black gloves or work-type gloves with exterior writing on them." Because there is no evidence in the record indicating that the phrase "with exterior writing on them" was intended to modify both the phrases "black gloves" and "work-type gloves," we conclude that the agents executing the warrant could reasonably have believed that the phrase "with exterior writing on them" modified only the phrase "work-type gloves." In turn, because the record indicates that the seized gloves were either black or brown in color[6], we agree with the district court and magistrate judge that the seized gloves "were within the ambit of items . . . specifically mentioned in the warrant . . . ." ROA, Vol. I, Doc. 39, at 5.

Johnson next argues that the camouflage duffel bag and the Michelob beer bottle contained therein should have been suppressed. The magistrate judge and the district court concluded that these items were properly seized under the "plain view" rule. That rule allows an officer to seize evidence of a crime if it is in plain view, its incriminating character is immediately apparent, and the officer has a lawful right of access to the item.

---

[6] Three gloves were seized: a pair of black gloves and a single brown glove.

Horton v. California, 496 U.S. 128, 136-37 (1990). Because there is no dispute that the duffel bag and the beer bottle were in plain view, and that the officers executing the search warrant had a lawful right of access to them, the applicability of the plain view rule hinges on whether their incriminating character was immediately apparent. "An item's incriminating nature is immediately apparent if the officer had probable cause to believe the object was contraband or evidence of a crime." United States v. Castorena-Jaime, 285 F.3d 916, 924 (10th Cir. 2002) (internal quotation marks and citations omitted). "A seizing officer need not know or have an unduly high degree of certainty as to the incriminatory character of the evidence under the plain view doctrine. All that is required is a practical, nontechnical probability that incriminating evidence is involved." Id. (internal quotation marks and citations omitted). The officers executing the search warrant at Johnson's residence had reasonable suspicion that Johnson had been involved in the abduction of the Moores and the robbery of the Keota bank. Further, the officers were aware that the Moores had given statements indicating that the masked men who abducted them drank a quantity of Michelob beer in bottles and disposed of some of the empty bottles in a duffel bag which they carried with them. In light of this information, we conclude the officers had probable cause to believe the Michelob beer bottle was evidence of the crimes at issue. Cf. United States v. Tucker, 305 F.3d 1193, 1203 (10th Cir. 2002) (concluding that officers had probable cause to believe that defendant's computer, located in his residence, contained child pornography given the information available to them regarding the defendant's likely involvement in child

-14-

pornography). As for the duffel bag, the Moores testified at trial that the duffel bag was black in color, not camouflage, and it is unclear from the suppression hearing transcript whether the officers executing the search warrant were aware of this fact. Assuming they were, then they would not have had probable cause to believe the camouflage duffel bag was evidence of the crimes at issue, and could not have seized it under the plain view rule. In contrast, if the officers were unaware that the Moores had indicated the duffel bag was black in color, they arguably could have had probable cause to believe the camouflage duffel bag was evidence of the crimes at issue and could have seized it. Ultimately, we conclude it is unnecessary to resolve this issue given the overwhelming nature of the evidence of Johnson's guilt introduced by the government at trial.[7] In other words, even assuming the camouflage duffel bag should not have been seized, we conclude its subsequent use at trial was harmless.

Lastly, Johnson refers to the lawn mower operator's manual, as well as the car tag, title and registration papers seized by the executing agents. As noted, the government conceded that these items were improperly seized and returned them to Johnson. In light of these facts, it is unclear precisely what ruling Johnson is seeking from this court. Clearly, the seizure of these items was harmless, considering that they were returned to

_____

[7] In addition to a wide variety of circumstantial evidence (e.g., two witnesses who testified they were solicited by Johnson to assist him in abducting the Moores and robbing the Keota bank), Johnson was linked to the Moores' house by (a) cellular phone records indicating that he made several phone calls from in or near the Moores' residence during the time the Moores were held captive, and (b) DNA evidence (i.e., bodily fluid taken from a discarded Michelob beer bottle at the Moores' residence).

Johnson and not admitted at trial (and indeed appear not to have been inculpatory in nature).

In sum, we conclude the district court did not err in ruling on the individual items seized by the executing agents.

<em>Bruton error</em>

During the government's case in chief, FBI agent Gary Graff testified that defendant Jimmie Perkins, following his arrest on April 25, 2003, confessed to participating in the robbery, including breaking into the Moores' home and holding them hostage. According to Graff, Jimmie Perkins stated there were "four other individuals" involved in the robbery, including three "Mexicans" that forced him to participate, and one other individual whose identity he knew. ROA, Supp. Vol. IV at 484. Jimmie Perkins denied that this latter person was his son, Anthony Perkins. Id. at 486. When asked if this latter person was defendant Johnson, Jimmie Perkins "would not eliminate Mr. Johnson from being involved in the robbery," id., and "preferred not to discuss Mr. Johnson." Id. at 487. Lastly, Graff testified that Jimmie Perkins agreed to provide a written statement outlining his participation in the robbery, and the district court admitted that statement into evidence. Id. at 497-500.

Defendant Johnson contends on appeal that the admission of Graff's testimony and Jimmie Perkins' written statement violated the rule announced in Bruton v. United States, 391 U.S. 123 (1968). In Bruton, the Supreme Court held that the admission of a nontestifying codefendant's confession implicating the defendant at their joint trial

-16-

violates the defendant's Sixth Amendment Confrontation Clause rights. 391 U.S. at 137; see also United States v. Sarracino, 340 F.3d 1148, 1159-60 (10th Cir. 2003). Generally speaking, we review de novo any alleged Bruton errors. See United States v. Verduzco-Martinez, 186 F.3d 1208, 1212 (10th Cir. 1999). Here, however, defendant Johnson did not object at trial to the admission of Gray's testimony or Jimmie Perkins' written statement. Thus, we review his Bruton claim only for plain error. To establish plain error, defendant Johnson must prove that there was an error, that was plain, and that affected his substantial rights. United States v. Olano, 507 U.S. 725, 732 (1993). If he can do so, we may exercise our discretion to correct the forfeited error if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. Id.

Assuming, for purposes of argument, that the admission of the challenged evidence violated Bruton, it is clear that the error did not affect defendant Johnson's substantial rights. As noted, the evidence of defendant Johnson's participation in the robbery was overwhelming. In addition to a wide range of circumstantial evidence (e.g., witnesses who had been solicited by Johnson to participate in an abduction of Ms. Moore and a robbery of the Keota bank; witnesses who observed Johnson surveilling the bank), the government also presented cell phone records and DNA evidence tying Johnson to the Moore's home during the time they were held hostage. Thus, Jimmie Perkins' refusal to exculpate Johnson in his post-arrest statements was but a minor component of the government's case against Johnson.

For these reasons, we conclude Johnson cannot establish that the admission of

-17-

Gray's testimony and Jimmie Perkins' written statement/confession constituted plain error.

*Sentencing errors*

a) *Booker* error

All three defendants assert challenges to their sentences based upon the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2005). In Booker, the Court held that the Sixth Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S.Ct. at 756. To remedy the potential for Sixth Amendment violations by a sentencing court's application of the Guidelines, the Court severed and excised 18 U.S.C. § 3553(b)(1), which had required sentencing courts to impose a sentence within the applicable guidelines range, subject to departures in limited cases. Id. at 764. As a result, the Guidelines are now advisory. Id. at 767. We have recognized two types of Booker-related error. "First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily." United States v. Gonzalez-Huerta, 403 F.3d 727, 731 (10th Cir. 2005) (en banc). This type of error, which violates the Sixth Amendment as described in Booker, is generally referred to in this circuit as "constitutional Booker error." Id. "Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated

solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction." Id. at 731-32. This type of error is referred to as "non-constitutional Booker error." Id. at 732.

Here, defendants allege, and we agree, that the district court committed constitutional Booker error by enhancing their sentences on the basis of judicially-found facts. After imposing a base offense level of 20 on each defendant pursuant to U.S.S.G. § 2B3.1 (which governs robbery offenses), the district court applied the following, fact-based enhancements: (1) a two-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(1) for taking the property of a financial institution; (2) a four-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(A) because a person was abducted to facilitate commission of the robbery; (3) a one-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(6) because firearms were taken from the Moores' house; (4) a one-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(7) because the amount of loss was more than $10,000 but less than $50,000; and (5) a two-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(5) because the offense involved car-jacking (i.e., the taking of the Moores' van).[8] With respect to defendant Johnson, the district court also imposed a two-level enhancement pursuant to U.S.S.G. § 3B1.1 based upon its finding that Johnson was the leader in carrying out the bank robbery. With respect to defendant Anthony Perkins, who was not charged under § 924(c), the district court also imposed a six-level enhancement pursuant to U.S.S.G. §

---

[8] The district court also, with respect to defendants Johnson and Jimmie Perkins, departed upward from the Guideline ranges.

-19-

2B3.1(b)(2)(B) for "otherwise using" a firearm during the robbery.

Because defendants did not assert Sixth Amendment challenges to these enhancements at the time of sentencing, they are reviewed on appeal only for plain error. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Gonzales-Huerta, 403 F.3d at 732 (internal quotation marks omitted).

Defendants can, given the holding in Booker, easily satisfy the first two prongs of the plain-error test. See United States v. Dazey, 403 F.3d 1147, 1174-75 (10th Cir. 2005). Specifically, in imposing these enhancements, the district court made five factual findings "based on a preponderance of the evidence that the defendants did not admit and the jury verdict alone did not support, pursuant to the then-mandatory Guidelines." United States v. Serrata, 425 F.3d 886, 917 (10th Cir. 2005). These errors are "now [considered] 'plain' or 'obvious.'" Id.

The more difficult question is whether defendants can meet their burden of satisfying the third prong of the plain error test. "In order to demonstrate that an error affected his substantial rights, a defendant must show a reasonable probability that the defects in his sentencing altered the result of the proceedings." Id. (internal quotation marks omitted). We have held that, in cases involving constitutional Booker error, "there are at least two ways a defendant can make this showing." Id. "First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not

-20-

have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below affected his substantial rights." Id. "Second, a defendant may show that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district judge would reasonably impose a sentence outside the Guideline range." Id. (footnote omitted).

After reviewing the record, we conclude defendants cannot prevail under the first method. To begin with, we conclude that a jury applying a reasonable doubt standard would have found all of the facts underlying the five enhancements that were applied to each of the defendants, i.e., that (a) the robbery involved the taking of property from a financial institution, (b) two people (Mr. and Mrs. Moore) were abducted in order to facilitate the commission of the robbery, (c) guns and scopes belonging to Mrs. Moore's son were taken from the Moores' house, (d) the amount of the loss suffered by the bank was more than $10,000 but less than $50,000, and (e) the offense involved car-jacking (i.e., the taking of the Moores' van). Likewise, we conclude a jury applying a reasonable doubt standard would have found that firearms were extensively used during the course of the offense, thereby supporting the six-level enhancement imposed on defendant Anthony Perkins for "otherwise using" a firearm. Finally, we conclude that a jury applying a reasonable doubt standard would have found that defendant Johnson was the leader and/or organizer of the offense. As we have noted, there was evidence that Johnson

attempted to solicit other people to participate in a robbery of the bank. In addition, the circumstantial evidence strongly suggests that Johnson was the person who took a lead role during the course of the offense, doing most of the talking and questioning in the Moore home, and threatening to rape Mrs. Moore.

We further conclude that defendants are unable to prevail under the second method, i.e., they cannot establish a reasonable probability that the sentencing judge, applying the sentencing factors of 18 U.S.C. § 3553(a), would reasonably have imposed a sentence lower than the Guideline range. In conducting the third-prong analysis in other plain error cases involving constitutional Booker error, we have generally examined the sentencing record for evidence "evinc[ing] a desire on the part of the court to give [the defendant] a sentence lower than the Guidelines-specified range." United States v. Lawrence, 405 F.3d 888, 907 (10th Cir. 2005). Here, nothing in the record suggests that the district court would have, had it believed it had the discretion to do so, imposed a below-Guideline sentence. Indeed, with respect to defendants Johnson and Jimmie Perkins, the district court departed upward in two respects and, after doing so, sentenced Johnson to a term that was in the middle of the suggested Guideline range, and also sentenced Jimmie Perkins to a term that was at the top of the suggested Guideline range. As for defendant Anthony Perkins, the district court imposed a sentence at the bottom of the suggested Guideline range. That fact standing alone, however, is not sufficient to allow us to conclude that the district would have, had it known it had the discretion to do so, imposed a below-Guideline sentence on defendant Anthony Perkins. Cf. United

-22-

States v. Nguyen, 413 F.3d 1170, 1184 (10th Cir. 2005) (concluding that sentence at bottom of Guideline range, combined with district court's general expression of sympathy, was "insufficient to satisfy plain error under the fourth prong").

In short, defendants cannot satisfy their burden of showing that the constitutional Booker errors committed by the district court affected their substantial rights. Most, if not all, of the sentencing enhancements imposed by the district court were based upon factual findings that were amply supported by the record (and that would likely have been reached by a jury applying a reasonable doubt standard). Further, the district court's actions at sentencing clearly indicate it had no desire to impose below-Guidelines sentences on any of the defendants, particularly defendants Johnson and Jimmie Perkins. Therefore, defendants cannot establish that the district court's enhancement of their base offense levels based upon judicially-found facts amounted to plain error.

*b) Upward departure - defendants Johnson and Jimmie Perkins*

Defendants Johnson and Jimmie Perkins also challenge the district court's decision to depart upward from the Guideline range based upon its findings "that the combination of the sophistication of the robbery, the duration of the abduction, the use of multiple firearms and making multiple and repeated threats of death to multiple victims, and the sexual assault of Mrs. Moore [we]re aggravating factors present to a degree not adequately considered by the Sentencing Commission in formulating the Guidelines." ROA, Supp. Vol. I, at 81. Because the upward departure was based upon facts found by the court rather than the jury, it must be considered violative of the holding in Booker.

See United States v. Cunningham, 405 F.3d 497, 504 (7th Cir. 2005) (noting that, in light of Booker, an upward departure may violate the Sixth Amendment). However, because neither Johnson nor Jimmie Perkins objected to the upward departure on Sixth Amendment grounds, their Booker-related challenge to the upward departure is now reviewed only for plain error.

As with the enhancements discussed above, the first and second prongs of the plain error test are easily satisfied. Specifically, it is clear that the district court erred in basing its upward departure on judicially-found facts, and, in light of Booker, that error is now considered plain.

Turning to the third prong of the plain error test, it is clear, given the district court's statements during the sentencing hearing, its decision generally to depart upwards, and its final decision to impose sentences in the middle and top of the guideline ranges for Johnson and Jimmie Perkins, that the district court would not exercise its discretion after Booker to impose lower sentences on these two defendants. See United States v. Rodriguez-Chavez, 153 Fed. Appx. 524, 528 (10th Cir. 2005) (reaching similar conclusion in case involving upward departure subject to harmless error review). Thus, the only way Johnson and Jimmie Perkins can satisfy the third prong of the plain error test is to show a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that the district court found and based its upward departure on. With respect to four of the five factors cited by the district court, it is clear, based upon reviewing the record, that a jury applying a reasonable doubt standard

would have found these same factors. Specifically, the evidence presented at trial overwhelmingly established that (a) the offenses of conviction lasted for an extended duration (i.e., from approximately 2 p.m. on the afternoon of March 31, 2003, until 7:30 or 8:00 a.m. on the morning of April 1, 2003), (b) multiple firearms were used during the commission of the offense, (c) multiple and repeated threats of death were made to the Moores during the commission of the offense, and (d) Mrs. Moore was sexually assaulted during the course of the offense.

That leaves only the district court's finding that the robbery was "sophisticated." In making this finding, the district court expressly pointed to "the defendants' knowledge of the location of the victim's home, choosing Mrs. Moore to abduct, disguising themselves as Mexicans, and the use of multiple firearms . . . ." ROA, Supp. Vol. I, at 80. A review of the record on appeal indicates that all of these underlying factors were well supported by the government's evidence, and therefore it can readily be concluded that a jury applying a reasonable doubt standard would have found the existence of these factors. The question remains, however, whether these factors reasonably supported the ultimate finding that the robbery was "sophisticated."

Nowhere does U.S.S.G. § 2B3.1 or its accompanying commentary mention "sophistication" as a relevant factor in determining the offense level for a defendant convicted of robbery. In other words, the "sophistication" of a robbery is a circumstance not typically taken into account by the Sentencing Commission in calculating the applicable guideline range for a robbery conviction. Further, "sophistication" is not a

factor outlined in Chapter Five, Park K, Subpart 2 of the Guidelines, which discuss "Other Grounds for Departure." Thus, for "sophistication" to serve as a valid basis for upward departure in a robbery case, the case itself must be considered "exceptional." See U.S.S.G. § 5K2.0(a)(2)(B).

After carefully examining the record, we conclude a jury applying a reasonable doubt standard could not reasonably have found that the case was exceptional in terms of sophistication. Generally speaking, the Guidelines define the term "sophistication" consistent with its ordinary meaning, i.e., "especially complex or intricate." See U.S.S.G. § 2B1.1(b)(8)(C) (referring to "sophisticated means"), and Application Note 7(B) thereto (indicating that means are "sophisticated" when they entail "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."); see also Oxford English Dictionary Online Edition (taken from second print ed. 1989) (defining term "sophisticated" as "highly developed or complicated"). Although the robbery at issue was the product of some planning on the part of Johnson and perhaps the other two defendants, it certainly cannot be characterized as exceptional in this regard. In particular, the scheme employed by defendants was straightforward in that it relied generally on abducting and controlling one key person, i.e., Mrs. Moore. Further, as pointed out by Jimmie Perkins, defendants were unaware at the time they took the Moores hostage that the bank's vault had a time-lock on it, and thus were unexpectedly forced to wait until the morning of April 1, 2003, to carry out the robbery. As for the execution of the robbery scheme, the fact that defendants brought beer to the

Moores' residence, drank the beer throughout the siege, and ultimately left some of the empty bottles at the Moores' house, clearly undercuts a finding that the crime was especially sophisticated. The same holds true for defendants' attempt to disguise their identities by speaking Spanish while inside the Moores' house. The evidence at trial indicated that this attempt was less than successful because defendants at times lapsed into English.

Notably, we have found only one published case touching on the issue of sophistication in the context of a bank robbery case. In United States v. Castro-Cervantes, 927 F.2d 1079 (9th Cir. 1990), the defendant had admitted to committing a series of bank robberies and, over the course of doing so, had learned, through trial and error, how to prevent a dye pack from exploding. In sentencing the defendant, the district court departed upward because of "'the sophistication' shown in [the defendant's] treatment of the dye packs . . . ." Id. at 1081. The Ninth Circuit affirmed this upward departure in two sentences:

> The [sentencing] court was . . . permitted "without limitation" to take into account information about Castro-Cervantes which had not been taken into account by the Guidelines. U.S.S.G. § 1B1.4. The Guidelines do not take into account the sophistication of the robber and, therefore, this factor is a proper ground for the sentencing court to take into consideration.

Id. Assuming, for purposes of argument, that the holding in Castro-Cervantes is correct, we conclude it has little, if any, relevance here. Unlike the defendant in Castro-Cervantes, the defendants in this case committed only a single robbery, and thus cannot themselves be characterized as "sophisticated" robbers. Nor, for the reasons outlined

above, can the single robbery committed by defendants reasonably be characterized as "sophisticated."

Because a jury applying a reasonable doubt standard could not have found that the robbery at issue was "sophisticated," Johnson and Jimmie Perkins have satisfied their burden under the third prong of the plain error test. That leaves only the fourth prong, under which they must persuade us that the constitutional Booker error committed by the district court "seriously affected the fairness, integrity, or public reputation of judicial proceedings." Serrata, 425 F.3d at 919. We conduct the fourth-prong analysis "less rigidly" in cases, such as this, involving constitutional Booker error than in cases involving non-constitutional Booker error, meaning that we "do not require the exceptional showing required to remand a case of non-constitutional error." Dazey, 403 F.3d at 1178.

In United States v. Dowlin, 408 F.3d 647, 671 (10th Cir. 2005), we recently outlined the types of "[e]vidence that would tend to support an exercise of our discretion under" the fourth prong in a case involving constitutional Booker error. We noted that such evidence "might include, for example: (a) a sentence increased substantially based on a Booker error . . . ; (b) a showing that the district court would likely impose a significantly lighter sentence on remand . . . ; (c) a substantial lack of evidence to support the entire sentence the Guidelines required the district court to impose . . . ; (d) a showing that objective consideration of the § 3553(a) factors warrants a departure from the sentence suggested by the Guidelines . . . ; or (e) other evidence peculiar to the defendant

that demonstrates a complete breakdown in the sentencing process . . . ." Id.

Although many of these factors weigh against Johnson and Jimmie Perkins, we conclude that the district court's reliance on a rarely-used factor, and one that it not supported factually, weighs heavily in Johnson's and Jimmie Perkins' favor. Further, we note that the two-level upward departure imposed by the district court substantially increased both defendants' sentences from what they otherwise would have been. Specifically, the two-level upward departure increased Jimmie Perkins' Guideline range from 188-235 months to 235-293 months. In light of the fact that the district court chose to impose a sentence at the top of the Guideline range, this means that the Booker error effectively increased Jimmie Perkins' sentence by 58 months. As for defendant Johnson, the two-level upward departure increased his Guideline range from 235-293 months to 292-365 months. Given the district court's decision to impose a sentence in the middle of the Guideline range (324 months), the Booker error resulted in a substantial increase in Johnson's sentence. We therefore conclude that these factors, considered together, weigh in favor of us exercising our discretion to remand Johnson's and Jimmie Perkins' cases for resentencing.[9]

*c) Additional arguments - defendant Anthony Perkins*

Defendant Anthony Perkins makes two other arguments regarding his sentence, both of which are without merit. First, he asserts that the constitutional Booker error

---

[9] On remand, the district court is free to consider whether the other factors it originally cited in support of the upward departure are sufficient, in the absence of a finding of sophistication, to again warrant an upward departure from the Guideline range.

committed by the district court in his case, i.e., imposing a series of enhancements based upon judicially-found facts, was structural in nature. We have previously rejected that identical argument. See Dowlin, 408 F.3d at 668 (holding that constitutional Booker error is not structural); Gonzalez-Huerta, 403 F.3d at 734 (holding that non-constitutional Booker error is not structural). Second, he argues that the district court lacked jurisdiction to impose a sentence beyond that which was authorized under the Sentencing Guidelines by the jury's factual findings. That argument flies directly in the face of both 18 U.S.C. § 3231, which affords district courts with subject matter jurisdiction over federal criminal prosecutions, as well as the remedial holding in Booker, which effectively authorized district courts, in their discretion, to take into account judicially-found facts in imposing criminal sentences.

The convictions of defendant Richard Johnson, as well as the sentence imposed on defendant Anthony Perkins, are AFFIRMED. The cases of defendant Richard Johnson and defendant Jimmie Perkins are REMANDED to the district court for resentencing.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

-30-